TELESERVICE COMPANY OF WYOMING VALLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57236. Filed January 29, 1957.

*Edward P. Morgan, Esq.*, for the petitioner.
*Norman A. Peil, Jr., Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in the petitioner's income taxes:

| Year ended January 31 | Deficiency |
| --- | --- |
| 1952 | $3,210.83 |
| 1953 | 13,013.09 |

Certain adjustments made by the Commissioner were not contested. The only issue presented in this case is whether "contributions" by subscribers to the petitioner's community antenna television system constitute gross income within the meaning of section 22 (a) of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Some of the facts are stipulated. Those facts and the stipulated exhibits are found as stipulated and are incorporated herein by this reference.

The petitioner is a corporation whose address is Wilkes-Barre, Pennsylvania. It was incorporated under the laws of the Commonwealth of Pennsylvania, in 1951. The petitioner filed its returns for the taxable years ended January 31, 1952 and 1953, with the district director of internal revenue at Scranton, Pennsylvania.

The petitioner promoted, constructed, and now operates for profit a community antenna television system at Wilkes-Barre and Kingston, Pennsylvania.

The residents of Wilkes-Barre and Kingston were unable by conventional television rooftop or built-in antennas to receive television signals of an adequate visual quality due to the fact that the cities were located in valleys surrounded by hills which effectively screened or cut off television signals which would otherwise be available for reception by conventional methods. Therefore in January 1951, the petitioner's incorporators determined that a company should be organized for the purpose of providing television signals to the residents of the Wilkes-Barre area through a community television system.

In 1951 no licenses for Ultra High Frequency (U. H. F.) television stations had then been issued, but there were indications that such licenses would be granted in the near future, and it was known that at least one company in Wilkes-Barre would make application for such license. This created a hazard of investing money in the enterprise.

The Radio Corporation of America (R. C. A.) provided engineers to make a survey of the projected system, and furnished estimates of the cost of the equipment and materials that would be required. Two other community antenna systems were also investigated and on the basis of their experience and the advice received from R. C. A., it was estimated that it would cost 96 cents per foot for the trunkline cable or feeder line cable to be installed and erected. This cost tended to be constant, regardless of the size of the system, since the only fixed cost was that of constructing the antenna tower which was relatively small ($1,500 to $3,000). It was calculated that the cost of constructing a system to serve Wilkes-Barre and Kingston would be as much as $250,000.

The incorporators held conferences with a certified public accountant with respect to the method of financing the company, including, among other things, the cost of operation, availability of capital, and money that could be borrowed. Before construction was begun or money paid into the company, it was decided that construction of the system would have to be financed essentially through contributions from prospective customers or subscribers.

Contributors were divided into two classes, residential and commercial. Contributions of $145 were solicited from the former and $200 from the latter. While installation costs were the same the incorporators believed that the commercial establishments could better afford to contribute a greater amount than could a private family. The amount of the original contributions was based upon construction costs and amounts solicited by other community antenna systems.

The charge for monthly maintenance of the system was set at $4 per month for residential subscribers and $6 per month for commercial subscribers. This charge was designed to cover the maintenance of the community antenna system and it included an element of profit. The rates were not set by any regulatory commission.

The community antenna system was constructed in several distinct stages. The first step was the erection of a tower and intercepting antennas and the installation of a main trunkline cable, approximately 5 miles in length, to the first distribution area. Cost of the first step was borne by the incorporators. Before further extension of the system potential subscribers were solicited for service. When a sufficient number of applications had been received to indicate that the extension would be feasible the petitioner entered into contracts with the subscribers and then construction proceeded in the area in which the subscribers were located. Six months elapsed after completion of the initial construction before the first extension of the system was undertaken, 45 days before the second extension, and about 60 days before the third extension. It was estimated that at least 50 per cent of the cost of construction of the extensions would be borne by the contributions of the subscribers. .

The contract which the subscribers signed provided as follows:

Telso [petitioner] agrees to furnish Subscriber at the place of installation as noted above a television signal transmission service. Subscriber agrees, in consideration of contributions from other Subscribers, to contribute the sum of _____ Dollars toward the total cost of constructing a system for the transmission of a television signal. Subscriber agrees to pay Telso a monthly maintenance charge of _____ Dollars. The rights and obligations of the parties to this contract shall be subject to and governed by the statements made by Subscriber on the application and by the terms and conditions on the reverse side of this contract, entitled "General Provisions", number one through———

*General Provisions*

\*   \*   \*   \*   \*   \*   \*

SECTION 12—TERMINATION OF SERVICE

 (a) TERMINATION—

  Public Utility Contracts—Government Permission

The service furnished by Telso under this contract is under and subject to the conditions of contracts entered into by Telso with various Railroads and Public Utilities and to the terms and conditions of resolutions of the cities, boroughs and townships in which the service is rendered, and to the terms and conditions of permits and licenses granted by various governmental agencies both state and federal. Insofar as they are relevant, the provisions of these contracts, municipal resolutions and governmental permits are by reference made a part of this contract. It is distinctly understood and agreed by Subscriber that the ability of Telso to continue service depends on the continuance in operation of the aforesaid contracts with the utilities, and with the continued authority granted by the various cognizant municipalities and governmental agencies. If for any

reason, whether or not due to the neglect or fault of Telso, said public utility and railroad contracts or municipal resolutions or governmental permits as they now exist, or as they are subsequently amended, are cancelled, amended, abrogated, terminated or otherwise changed so as to make it, in the sole judgment of Telso, either impossible or impractical for Telso to furnish television transmission service under this contract, Telso shall have the right to terminate this contract. In the event of termination under this section, all contributions, maintenance rates, and other moneys paid Telso by Subscriber shall be forfeited. Subscriber shall not be entitled a refund of any kind.

(b) TERMINATION—DEFAULT BY SUBSCRIBER

Telso may terminate this contract by written notice to Subscriber whenever Subscriber violates a provision of this contract and the right to terminate for default is given to Telso. Whether Subscriber has violated the contract shall be a matter for the sole determination of Telso. If Telso terminates this contract under the provisions of this section, Subscriber shall not be entitled to a refund of any kind, and Telso shall in no wise incur any liability.

(c) TERMINATION—FOR CONVENIENCE OF SUBSCRIBER OR TELSO

Subject to the provisions of Sections (a) and (b), and subject to the failure of service as provided in Section 1 (c) and (d), either the Subscriber or Telso may terminate this contract on thirty (30) days written notice to the other. A termination notice addressed to the Subscriber at the address appearing on this contract, with postage prepaid, shall be compliance with notice under this Section.

(1) If Telso terminates this contract under this section, Subscriber shall be refunded a part of his contribution money, as follows:

i. A maximum of Sixty (60) Dollars less Ten (10) Dollars for each month this contract has been in effect.

ii. There shall be no refund of any other charge.

(2) If Subscriber terminates this contract under this section, Subscriber shall not be entitled to a refund of any kind.

* * * * * * *

SECTION 17—ASSIGNMENT

Neither this contract nor any interest herein nor any claim arising hereunder shall be assigned by the Subscriber.

While a contribution was a prerequisite to use of the system, it alone did not entitle the contributor to receive television signals. The contributor also had to make monthly payments, in advance, in order to receive the signals.

A contributor could not sell, assign, or transfer his eligibility to receive television signals, but he remained eligible to receive the signals without additional cost if he moved to another part of Wilkes-Barre or Kingston. However, the person who moved into the contributor's old home was required to make a contribution in order to become eligible to use the system.

No change was ever made in the $4 monthly charge for maintenance in the case of a residence, or in the $6 monthly charge in the case of a commercial establishment. Also the $200 contribution required of commercial establishments was never changed. However, the amount required of residential subscribers was reduced to $89 on January 1, 1953, to $80 on June 1, 1954, to $30 in August 1955,

and no contributions have been required since the beginning of 1956.

The greatest number of connections in operation at one time was about 900 and the least was about 200 to 300. In 1956 there were about 400 connections in operation. The decrease in connections resulted in 1952 when U. H. F. licenses were granted to local television stations in Wilkes-Barre and Scranton. The number of contributions also fell off sharply at that time.

During the period February 20, 1951, to January 31, 1952, the petitioner received under contracts initial payments, other than payments for monthly maintenance, totaling $27,601.98; during the same period construction costs of the system totaled $62,880.64.

During the period February 1, 1952, to January 31, 1953, the petitioner received under contracts initial payments, other than payments for monthly maintenance, totaling $88,544.79; during this same period construction costs of the system totaled $70,620.78.

The television antenna systems equipment had no salvage value.

All initial payments received by the petitioner were credited to an account maintained in its books and records called "Customer Contributions." Segregation of the funds paid as contributions was maintained on the books of accounts of the petitioner, as against sums received from monthly maintenance charges. The funds were deposited in the petitioner's general bank account from which were paid general operating expenses and the cost of all assets acquired. However the petitioner's accounting system segregated the costs of construction and the amounts contributed. At no time has the total amount of contributions ever equaled the capital outlay required to construct the system.

The petitioner did not claim deductions upon its income tax returns for depreciation of the physical facilities of the community antenna television system but showed the accounting depreciation as a nondeductible item.

### Ultimate Finding.

The contributions to the petitioner were not gifts or contributions to capital; they were part of the payment for services rendered or to be rendered by the petitioner and are includible in petitioner's gross income.

#### OPINION.

The Commissioner included the above-referred-to contributions in the petitioner's gross income during the taxable years and determined a deficiency accordingly. In such determination he allowed the petitioner a deduction for depreciation of the physical assets of the community antenna television system. The propriety of the Commissioner's determination is the issue involved in this case.

The petitioner takes the position that the contributions were contributions in aid of construction and thus not subject to taxation as income. It relies upon the following alleged characteristics of the contributions to show that they were in aid of construction: (1) The parties intended that the contributions be devoted to construction of the capital facility; (2) the contributions were so denominated by contract; (3) the amount of the contribution was reduced from time to time so as not to exceed the costs of construction; (4) the contributions were treated in tax returns and on the books as contributions in aid of construction; (5) the contributions never exceeded construction costs and never were intended to provide and did not provide a source for payment of dividends, interest, etc., the monthly maintenance charge being, as intended, the only source of profit; (6) the capital facilities were without salvage value, thus obviating any possibility of gain to the petitioner from the contributions; and (7) the contributions were never made nor received for services rendered or to be rendered and they conferred no direct benefit upon the contributor, since he was required to make monthly payments as a condition precedent to receiving monthly service from the antenna system. As authority for its position that contributions in aid of construction are not taxable as income, the petitioner cites: *Edwards v. Cuba Railroad*, 268 U. S. 628 (1925); *Liberty Light & Power Co.*, 4 B. T. A. 155 (1926); *Great Northern Railway Co.*, 8 B. T. A. 225 (1927), affd. 40 F. 2d 372, certiorari denied 282 U. S. 855; *Texas & Pacific Railway Co.*, 9 B. T. A. 365 (1927); *Rio Electric Co.*, 9 B. T. A. 1332 (1928); *Wisconsin Hydro-Electric Co.*, 10 B. T. A. 933 (1928); *El Paso Electric Railway Co.*, 10 B. T. A. 79 (1928); *Tampa Electric Co.*, 12 B. T. A. 1002 (1928); *Midland Valley Railroad Co.*, 19 B. T. A. 423 (1930); *Union Pacific Railroad Co.*, 26 B. T. A. 1126 (1932); and *Texas & P. Ry. Co.* v. *United States*, 52 F. 2d 1040 (Ct. Cl., 1931), affirmed without discussion of this point 286 U. S. 285 (1932).

In *Edwards* v. *Cuba Railroad, supra*, the taxpayer received certain properties and money subsidies from the Republic of Cuba in connection with the construction of a railroad line. The taxpayer built the railroad itself and owned it, but the Cuban Government paid it a certain amount per mile as the work progressed, pursuant to an offer which was designed to induce someone to build a railroad. The Supreme Court held that the subsidy payments did not constitute income within the meaning of the Sixteenth Amendment since they were not made for services rendered or to be rendered and were not profits or gains from the use or operation of the railroad, but were made to reimburse the taxpayer for capital expenditures. In *Liberty Light & Power Co., supra,* individuals desiring to obtain electric service constructed transmission lines and transferred them

to the taxpayer who was required by law to maintain them and furnish service to the individuals. The Board of Tax Appeals (now the Tax Court) held that the transmission lines did not constitute income to the taxpayer under the rule of the *Cuba Railroad* case. It said that the transmission lines were contributed by the individuals to the capital of the taxpayer and were not payment for services rendered or to be rendered. In *Great Northern Railway Co.*, *supra*, it was the practice of the taxpayer, where an industry located along its tracks desired transportation facilities from its plant, to construct the necessary spur track, take title to so much thereof as lay on its right-of-way, and require the industry to pay the cost of construction. The Board of Tax Appeals held that such payments were contributions in aid of construction and did not constitute income, under the rule of the *Liberty Light* case. The other cases cited by the petitioner, *supra*, involve factual situations which are substantially identical to those involved in the *Liberty Light* and *Great Northern Railway* cases, and the rule of those cases was held controlling.

The Commissioner contends that the contributions are includible in the petitioner's gross income under section 22 (a) of the Internal Revenue Code of 1939. His position is that section 22 (a) taxes all gains constitutionally taxable except those specifically exempted, and he cites as authority *Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426 (1955), and *Gen. Investors Co.* v. *Commissioner*, 348 U. S. 434 (1955). He contends that such contributions are constitutionally taxable and that they are not specifically exempted from taxation since they are neither gifts nor contributions to capital.

We agree with the Commissioner.

During the taxable years, only those persons who made contributions to the petitioner's community television antenna system were eligible to use such system upon further payment of monthly charges. Those who did not make contributions could not use the system. A contributor could not sell, assign, or transfer his eligibility to receive television signals, although once having contributed he remained eligible to receive the signals even though he moved to a different part of Wilkes-Barre or Kingston. However the person who moved into the original contributor's old home was required to make a contribution of his own in order to become eligible to use the system. It should be noted that under certain circumstances part of a contribution was refundable, but we are not concerned with these provisions, since the controversy here relates only to payments which by the contracts have ceased to be refundable. We see nothing in the contracts between the petitioner and subscribers that bound the petitioner to use the "contributions" for any particular purpose.

In view of these characteristics we have made an ultimate finding

that the contributions are not gifts or contributions to the petitioner's capital, but are part of the price of services rendered or to be rendered. We think that this finding is inevitable in spite of the voluminous authority cited by the petitioner to support its position that the contributions are in aid of capital construction and thus are not taxable income.

In *Detroit Edison Co.* v. *Commissioner*, 319 U. S. 98 (1943), the taxpayer was engaged in the generation of electricity and its distribution to the public. The taxpayer received applications for service, which, in its opinion, required an investment in extension of its facilities greater than prospective revenues therefrom warranted. In such cases it would render the services if the applicant would pay the estimated cost of the necessary construction. The taxpayer would construct the facilities which then became its property and add the full cost to its appropriate property accounts without deduction for the customer payment. It claimed as a basis for depreciation the investment for which it was reimbursed. In holding that it was improper for the taxpayer to include the amount of the customer contributions in its basis for depreciation, the Court said:

> The Company, however, seeks to avoid this result by the contention that what it has obtained are gifts to it or contributions to its capital of the property paid for by the customer, and that therefore * * * it takes the basis of the donor or transferor. It is enough to say that *it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a semblance.*
>
> *The payments were to the customer the price of the service.* * * * [Emphasis supplied.]

We are unable, in substance, to distinguish between the facts of the *Detroit Edison* case and the case at bar. Nor are we able, in substance, to distinguish factually between the *Detroit Edison* case and every one of the cases cited above by the petitioner except *Edwards* v. *Cuba Railroad*. In spite of the sheer weight in number of those decisions, we feel bound to make an ultimate finding consistent with that of the *Detroit Edison* case, and what in our view appears to be a gradually but persistently broadening concept of taxable income as exemplified by the *Glenshaw Glass Co.* and *Gen. Investors Co.* cases, *supra*. As for the *Cuba Railroad* case, which the petitioner so strongly relies upon, we think that case is clearly distinguishable from the present one due to the character and motive of the contributor involved therein. There, the Republic of Cuba was the contributor. Its motive in making the contributions was governmental and altruistic; the sovereign had the public interest in mind when it offered the subsidies to induce the construction of a railroad. The subsidies were not given to obtain concessions in respect of rates for

government transportation. Here we have an entirely different situation. Paraphrasing the dissent in *Liberty Light & Power Co.*, *supra*, there was nothing altruistic in the motive which prompted the petitioner's prospective customers to finance the television antenna system; they wanted television service and they were willing to pay for it. If the system had already been constructed and available they would have paid a larger monthly charge and this unquestionably would have been within the petitioner's gross income. Since the facilities were not available and due to the risk involved, the only way that the petitioner could be induced to give service was by the receipt of something in addition to the monthly charge, namely, contributions to enable it to construct extensions of the antenna system. Contributions received in this manner are within the gross income of the petitioner.

We think that the Supreme Court, in deciding the *Cuba Railroad* case, did not intend that the theory of that case should be extended so as to free from taxation a private contribution made in consideration of the performance of the contributee's normal business function. We have support for this view from the *Detroit Edison* case, where the Supreme Court said:

[The contributions] have not been taxed as income, presumably because it has been thought to be precluded by this Court's decisions in *Edwards* v. *Cuba R. Co.*, * * * holding that under the circumstances of that case a government subsidy to induce railroad construction was not income.

We hold that the contributions in this case are not gifts or contributions to the petitioner's capital, but are the price of services rendered or to be rendered and accordingly they are includible in the petitioner's gross income under section 22 (a).

Reviewed by the Court.

*Decision will be entered for the respondent.*

OPPER, *J.*, concurring: In *Detroit Edison Co.* v. *Commissioner*, 319 U. S. 98, depreciation deductions were denied on the ground that the taxpayer had no basis. The circumstances under which it had acquired the property seem to me indistinguishable from those present here. There, as here, the taxpayer had no cost. It was assumed that the only way a basis could be achieved was by treating the acquisition as a gift, thereby conferring the basis of the transferor. This theory the Supreme Court refused to adopt.

Speaking of the treatment of the acquisitions from the standpoint of taxable income, all that is clear is that they had not been taxed or reported, presumably on the authority of *Edwards* v. *Cuba Railroad*, 268 U. S. 628. *Detroit Edison* takes no position as to the correctness of that treatment, and I agree with the present Opinion that we are

free to decide here that the value of the contributions constituted income taxable to petitioner in that it was not a gift, *Detroit Edison Co.* v. *Commissioner, supra,* nor a contribution to capital. Cf. *Brown Shoe Co.* v. *Commissioner,* 339 U. S. 583.

But under the *Detroit Edison* dictum there are only two possibilities. The first is that the contributions never were taxable income and in that event, of course, the present result would be incorrect. The second possibility is that although they should have been reported as taxable income, they failed to attain a basis for depreciation because they had never been taken up in the taxpayer's income. Theoretically where, as in *Detroit Edison* and here, only cost can furnish a basis, the basis would be zero where there is no actual cost. *Helvering* v. *Gowran,* 302 U. S. 238. But where the subject matter has been taken up in income, courts have thought it equitable to attribute a basis to that extent. *Maurice P. O'Meara,* 8 T. C. 622. See *Artis C. Bryan,* 16 T. C. 972; *Johnson* v. *Commissioner,* (C. A. 5) 162 F. 2d 844.[1]

The difficulty with the second hypothesis is that less than 3 months after the *Detroit Edison* opinion was handed down, the Second Circuit held that a taxpayer could take a deduction for a loss on property which should have been but never was reported for tax purposes, even though there was no cost or other statutory basis. *Bennet* v. *Helvering,* (C. A. 2) 137 F. 2d 537. This result was reached without any reference to *Ruth B. Rains,* 38 B. T. A. 1189, upon which the Opinion below had been grounded. The *Rains* case was itself merely the culmination of a long line of similar results.[2]

---

[1] On the other hand it is said that if she had returned the gain in 1929 and paid taxes on it, the fair value thus capitalized into the property would have been recognized as a proper basis in fixing the gain on the sale in 1938.
\* \* \* \* \* \* \*
Since the value was not then or since taken into the tax account as a capital investment, there is no occasion to add it to the basis of the property when sold to avoid taxing it a second time. Justice has been done. \* \* \* [*Johnson* v. *Commissioner, supra,* at p. 846.]

[2] The cases last above cited [*Pearl A. Long,* 35 B. T. A. 479; affd. 96 F. 2d 270; *George N. Crouse,* 26 B. T. A. 477; *Searles Real Estate Trust,* 25 B. T. A. 1115; *Henry V. Poor,* 11 B. T. A. 781; affd. 30 F. 2d 1019; *Bothwell* v. *Commissioner,* 77 F. 2d 35; *Larkin* v. *United States,* 78 F. 2d 951] are predicated upon the general principle that a taxpayer can not take as a deduction the loss of a gain which has not been reflected in income. For example, in the *Poor* case, *supra,* the taxpayer deducted from gross income as a bad debt the full amount of a judgment embracing $484.21 interest which had at no time been included in his reported income. The Board applied the principle stated, notwithstanding the taxpayer kept his books on a cash receipts and disbursements basis, and the uncollected interest, therefore, was properly excluded from his gross income.

In the instant case, petitioner is not seeking to deduct directly from gross income the amount of the uncollected royalties, and if such a deduction were claimed, it would not be allowable under the doctrine referred to. However, petitioner is attempting to attain the same result by including the amount of the royalties in the basis to be deducted in computing gain or loss \* \* \*

Substantially the same principle has been applied and the same results obtained in analogous situations based upon slightly different reasoning. In *William Merriam Crane,* 27 B. T. A. 360; affd., 68 Fed. (2d) 640, the petitioner owned certain realty which had been leased to an insurance company. The lessee made improvements of substantial value in 1920 which were to revert to the lessor upon termination of the lease. Petitioner

Basis for gain or loss and basis for depreciation being for all practical purposes identical—with adjustments and exceptions not here pertinent, secs. 113 and 114, I. R. C. 1939; *Johnson* v. *Commissioner*, *supra*—the reasoning of the *Bennet* case would mean that *Detroit Edison* must inferentially have decided that the contributions involved there had never been properly reportable as taxable income. In other words, if the *Bennet* result is right, the present conclusion must be wrong.

But since I think the theory of the *Bennet* case cannot be supported,[3] I agree with this result.

———

KERN, *J.*, dissenting: In this case we are not concerned with the effect of the contributions here involved on petitioner's basis for depreciation with regard to the property purchased with those contributions, but with the question of whether these contributions constitute income taxable to petitioner. In my opinion, they were contributions of capital made by the contributors in order to furnish the funds necessary for the construction of a television signal transmission system by a corporation just starting out in business and having itself insufficient capital with which to construct such a system. It is obvious that without these contributions, which furnished 87 per cent of the funds spent for the construction of the necessary facilities by petitioner during the period February 20, 1951, to January 31, 1953, petitioner could not and would not have begun business. I am unable to see why these contributions, which in my opinion were contributions to petitioner's capital, must be taxed as income to petitioner merely because the ultimate motive of the contributors was their interest in obtaining services which could not have been available to them unless and until they had furnished by this means

———

sold the property in 1927, and contended that in computing gain or loss on the sale he was entitled to deduct the depreciated cost of the improvements, although he had never reported any part of such cost or value in his income. We denied the deduction on the ground that an income item is not, for tax purposes, converted into a capital asset, having a cost basis, until it is first taken into income. * * *

In *Commissioner* v. *Farren*, 82 Fed. (2d) 141, the taxpayers in 1918 each received shares of stock in an oil company as compensation for services rendered. Although taxable as income for 1918, no return was made for that year, on the theory that no income was derived until the stock was sold. The stock was sold in 1926, and the taxpayers contended they were entitled to deduct the value of the stock when acquired, notwithstanding such value had not been returned as income. The deduction was disallowed.

In *Long* v. *Commissioner*, 96 Fed. (2d) 270, affirming 35 B. T. A. 479, the court held that the worthless obligation of a husband to pay alimony was not deductible as a bad debt, since there was no cost basis of the debt sought to be deducted.

In *Alamo National Bank of San Antonio, Executor*, 36 B. T. A. 402; affd., 95 Fed. (2d) 622, the petitioners were the sole stockholders of a corporation from which they received a Coca-Cola franchise in 1921 as a liquidating dividend, but did not include in their income for that year any amount on account of the receipt of the franchise. They sold the franchise in 1931, and we held they were not entitled to deduct any value for the franchise as a basis for computing gain from its sale. [*Ruth B. Rains, supra,* at pp. 1196, 1197.]

[3] See footnote 2, *supra.*

the capital which petitioner required in order to erect the facilities necessary for the furnishing of such services.

In my judgment, the situation presented by the instant case is distinguishable from that referred to by the dictum in the *Detroit Edison* case quoted in the majority Opinion—a dictum appearing in an opinion which considered the question of basis for depreciation rather than the question of whether the contributions constituted income. In any event, it would seem to me to be better judicial technique for this Court to follow the clearly applicable and heretofore unreversed precedents furnished us by *Edwards* v. *Cuba Railroad*, 268 U. S. 628; *Great Northern Railway Co.*, 8 B. T. A. 225, affd. 40 F. 2d 572, certiorari denied 282 U. S. 855, and the other cases noted in the majority Opinion, rather than to assume from "a gradually but persistently broadening concept of taxable income * * * exemplified by the *Glenshaw Glass Co.* and *Gen. Investors Co.* cases" that the Supreme Court, by its dictum in the *Detroit Edison* case, intended to overrule the long line of cases starting with *Edwards* v. *Cuba Railroad, supra.*

Upon the facts of the instant case, and applying the law as it is revealed to us by existing precedents, it is my judgment that the issue before us should be decided in favor of the petitioner, and I, therefore, note my dissent.