Northeast Coal & Dock Corporation v. Commissioner.
Northeast Coal & Dock Corp. v. Commissioner
Docket No. 82141.
United States Tax Court
T.C. Memo 1961-199; 1961 Tax Ct. Memo LEXIS 154; 20 T.C.M. (CCH) 992; T.C.M. (RIA) 61199; June 30, 1961
William H. Deck, Esq., Pennsylvania Bldg., Washington, D.C., for the petitioner. Charles T. Shea, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent has determined a deficiency in the petitioner's income tax for the year 1956 in the amount of $4,162.54. The only issue presented is whether the amount of $14,110.31 received by petitioner from another corporation to which petitioner leased facilities and furnished services for use in improving and expanding operating facilities is includible in petitioner's taxable income. Findings of Fact Petitioner is a corporation which was organized and incorporated under the laws of the State of Maine in 1934. It has its principal business office at 450 Main *155 Street, Bangor, Maine. Petitioner filed its 1956 Federal income tax return with the district director of internal revenue at Augusta, Maine. During the year 1956, petitioner kept its books of account and filed its income tax return on an accrual basis and its taxable year was the calendar year. Petitioner operates dock facilities on the Penobscot River at Bucksport, Maine, unloading vessels carrying coal and sulphur. The petitioner's facilities include a tract of land adjacent to the Penobscot River on which is located a concrete storage silo and conveyor belts. Petitioner's title to the land adjacent to the river extends only to the high water mark. Petitioner's dock is "T" shaped and most of it stands on riverbed not owned by petitioner. In 1956 petitioner had both a lease and an operating agreement with the Freeport Sulphur Company (hereinafter referred to as Freeport). These two agreements had been in effect with modifications between the parties and their predecessors since 1932. The property leased by petitioner to Freeport consisted of the concrete storage silo, conveyor belts, and the land upon and over which the same stood at a rental of $100 per year. This lease, by *156 amendment of November 1, 1955, had been extended to November 30, 1968. No portion of the dock or the land or riverbed upon which the dock stood was included in the property leased by petitioner to Freeport. The operating agreement in effect in 1956 between petitioner and Freeport provided that petitioner would transfer sulphur delivered by Freeport in ships alongside petitioner's dock from the hold of the ship into storage and from storage into railroad cars at agreed rates per ton. The services furnished by petitioner also included storage, weighing of cars light and loaded, any necessary trimming, and billing and forwarding of cars at agreed rates per ton. Some of the provisions of the agreement which was entered into in 1948 and has been renewed yearly with only minor changes primarily in the amount of the rates per ton were as follows: WHEREAS the Dock Company [petitioner] has leased to the Sulphur Company [Freeport] a concrete storage silo and sulphur handling equipment and the land upon or over which the same stand, adjoining the premises owned by the Dock Company near the town of Bucksport, Maine, and WHEREAS the Sulphur Company desires to land at, and store and ship *157 sulphur through, the port of Bucksport in its regular course of business to the maximum extent that economic and physical conditions make this feasible and practical, and to accomplish this is prepared to make, or cause to be made, as soon as conveniently possible and at its own expense, repairs, renovations and improvements to said concrete storage silo and sulphur handling equipment heretofore determined to be necessary by its own representatives and by William Neill Constructors, Inc., and WHEREAS the Dock Company desires to handle and store sulphur for the Sulphur Company provided the aggregate volume of sulphur, coal and other commodities made available to it for handling and storage is sufficient to enable it to operate its plant and facilities at Bucksport, Maine, without incurring actual loss. * * *
4. The Dock Company agrees to provide berth, free of charge, for all vessels carrying sulphur to be discharged and handled under this contract, immediately upon arrival of vessel at Bucksport, Maine, or, in the event of the Dock Company's dock being occupied by another vessel upon arrival of the Sulphur Company's vessel, then as soon as the dock can reasonably be made available. *158 5. The Dock Company agrees to provide sufficient water up to and alongside its dock during the life of this contract to permit safe handling and docking of vessels up to twenty-four (24) feet draft. * * *
8. In the event of the partial or total loss during this contract of any equipment owned by the Dock Company and used in the handling or storage of sulphur for account of the Sulphur Company, the Dock Company agrees promptly, and with due diligence, to repair and/or replace such damaged or destroyed equipment, so as to continue performance under this contract with as little delay as posible. The provisions of this paragraph shall not apply, however, to handling or storage equipment leased by the Dock Company to the Sulphur Company. * * *
13. The Dock Company hereby gives the Sulphur Company, during the life of this agreement, the sole and exclusive right to discharge, store, reload or otherwise ship sulphur at, on or over the Dock Company's dock and/or premises at Bucksport, Maine. * * *
16. Unless previously terminated as provided in paragraph 15, this contract shall remain in full force and effect for a period of one (1) year from the date of the completion *159 of the repairs, renovations and improvements provided for in paragraph 1 hereof, and may be extended for further period or periods by mutual consent. Sometime during 1955 or before it became evident that the 5,000 to 6,000 ton vessels which had been used for transporting Freeport's sulphur to petitioner's dock were being or would soon be replaced by 8,000 to 10,000 ton liberty type vessels. In order for the larger vessels to be safely berthed at petitioner's dock, it was determined that the dock would have to be lengthened by 110 feet and strengthened overall. Freeport had plans for the lengthening and strengthening of the dock drawn up. These plans called for the construction of three new timber pilings and timber framed dolphins and five welded steel framed walkway trusses to be added to the existing dock. Construction bids were solicited from various contractors by petitioner and a contract was entered into by petitioner with a contractor selected by petitioner for the work after Freeport gave its approval to the bid. The arrangement made between petitioner and Freeport was that Freeport would advance to petitioner $28,220.61, the contract price for the work to be done to the *160 dock. This amount was to be paid by petitioner to the contractor as the work progressed and should the final cost be less than $28,220.61 the difference was to be returned to Freeport. Under the arrangement petitioner was to repay Freeport only half ($14,110.30) of the amount advanced and the repayment was to be made over a period of a year or more at a rate equal to graduated money amounts per ton of sulphur handled at petitioner's dock. Under date of June 27, 1956, the Department of the Army, Corps of Engineers, gave its authorization for the proposed work to be done to petitioner's dock. This authorization was necessary since most of petitioner's dock, including the part on which the work was to be done, was located in navigable waters beyond the high water mark. On July 28, 1956, petitioner received the $28,220.61 from Freeport to cover the cost of the work and placed this amount in its regular bank account. Payments were made by petitioner to the contractor as the work on the dock was performed during 1956, the total of such payments being $28,220.61. Petitioner capitalized the dock improvements at $14,110.30, the amount petitioner was obligated to repay to Freeport and claimed *161 a depreciation deduction in 1956 based on this amount. Petitioner's receipts from Freeport arising out of its sulphur handling contract account for 75 percent of petitioner's total income. Under its agreement with Freeport, petitioner was permitted to load and unload and furnish dockage for vessels carrying any commodity except sulphur. However, the only vessels which petitioner serviced other than those of Freeport, were coal barges. Petitioner's dock as it stood before the improvements was and has continued to be adequate to handle all vessels serviced by petitioner other than those in which Freeport's sulphur was delivered. Petitioner agreed to bear one-half the cost of the dock improvements since it believed that unless it did so it might lose its contract for handling sulphur for Freeport. Respondent increased petitioner's income as reported by it by $13,875.14 by adding thereto the $14,110.31 received by it from Freeport and allowing an additional depreciation deduction of $235.17 because of that adjustment with the following explanation: The contributions to the taxpayer by the Freeport Sulphur Company were not gifts to taxpayer or contribution to its capital, but were part *162 payments for services rendered or to be rendered and therefore includible in gross income under section 61(a) of the Internal Revenue Code of 1954. The amount of $14,110.31 received by petitioner from Freeport in 1956 which it was not required to repay was in payment of services rendered or to be rendered by petitioner to Freeport. Opinion The sole issue presented is whether the amount of $14,110.31 which petitioner received from Freeport is includible in its gross income under section 61(a) of the Internal Revenue Code of 1954. Petitioner argues that the whole $28,220.61 expended for the dock improvement represented improvements made by a lessee for its own benefit and, therefore, does not constitute income in whole or in part to the lessor, petitioner. Petitioner contends that it did not want the dock improvement its lessee, Freeport, wished to install, had no need thereof, has not used it in its own business, and did not in any event agree to accept the value of the improvement as additional rent. In conclusion, petitioner states that the record clearly shows that it and Freeport did not intend the improvements paid for by Freeport *163 to be remuneration of any sort to petitioner. Respondent contends that the $14,110.31 amount is includible in income as a payment in aid of construction which was made in return for services rendered or to be rendered by petitioner. Petitioner's primary argument in this case is premised on the fact that it leased the dock to Freeport, that the improvements were undertaken by Freeport as lessee to suit its own business ends, and that no advantage accrued to petitioner from the improvement that was made. The record does not support petitioner's premise. It is clear from the evidence that petitioner did not lease the dock or the land on which it stood to Freeport but rather retained complete ownership and control thereof. The operating contract between petitioner and Freeport which was on a yearly basis provided that only Freeport could bring sulphur to petitioner's dock for discharge. Except for its agreement with Freeport as to vessels carrying sulphur, petitioner was free to and did unload vessels at its dock for others. It is true that Freeport did lease from petitioner for a yearly rental of $100, storage and sulphur handling facilities for which it would have little use if *164 its boats could not be accommodated for unloading at petitioner's dock. This fact undoubtedly added to Freeport's desire to have petitioner's facilities improved to the extent necessary to handle its boats and influenced Freeport in the amount it was willing to pay to have petitioner's dock able to accommodate its boats. Freeport, in the instant case, as the customers of the taxpayer in Teleservice Company of Wyoming Valley, 27 T.C. 722 (1957), aff'd 254 F. 2d 105, (C.A. 3, 1958), certiorari denied 357 U.S. 919 (1958) wanted the service and was willing to pay for it. Here as in that case, if Freeport had paid petitioner an increased per ton handling charge in return for petitioner's defraying the full cost of the improved dock facilities, such amount would unquestionably have been includible in petitioner's gross income. The instant case falls squarely within the holding of Teleservice Company of Wyoming Valley, supra. In that case contributions were made by prospective customers of the service corporation to enable the corporation to construct facilities so as to be able to serve the customers. In the present case the contribution *165 was by Freeport, petitioner's customer, to petitioner to expand and improve existing facilities so as to enable petitioner to continue to serve Freeport. Petitioner's final contention is that neither it nor Freeport intended the $14,110.31 to be remuneration of any sort to petitioner either as payment of rent or for services rendered or to be rendered and that, therefore, the amount should not be treated as income. Petitioner in this argument concedes that if there had been an intent by the parties to treat the $14,110.31 amount as remuneration it would be taxable income to petitioner. The intent of the parties must be gathered from their actions and not from the conclusions of petitioner's officers. Petitioner had been rendering services to Freeport for many years under a written agreement. At least since 1948 the agreement had been for a period of 1 year with yearly renewals. When Freeport contributed $14,110.31 to petitioner for the dock improvement it knew that the operating contract would extend for the balance of 1956 and anticipated that it would continue in effect thereafter. This is evidenced by the fact that the arrangement was to the mutual benefit of the parties, petitioner *166 receiving 75 percent of its revenues therefrom and Freeport being enabled to make use of the sulphur storage and handling equipment adjacent to the dock which it had under lease from petitioner until November 30, 1968. Petitioner's desire to continue its contract with Freeport is evidenced by the fact that it agreed to bear one-half the cost of the dock improvement because it believed that if it did not it might lose the business of handling sulphur for Freeport. The provision for repayment of the $14,110.30 which had been advanced to petitioner by Freeport with agreement as to its repayment also suggests that the parties anticipated continuance of the contract for future years since payments by petitioner to Freeport were to be made over a period of a year or more in amounts based upon the amount of sulphur handled by petitioner for Freeport. It is clear that the $14,110.31 advanced by Freeport was in anticipation that sulphur handling services would be rendered by petitioner for Freeport in the future. The $14,110.31 paid to petitioner by Freeport was for services rendered or to be rendered and is includible in petitioner's income in the year of its receipt. Decision will be *167 entered for respondent.