The Minnequa University Club, A Colorado Corporation (Not For Pecuniary Profit) v. Commissioner.
Minnequa University Club v. Commissioner
Docket No. 5656-69.
United States Tax Court
T.C. Memo 1971-305; 1971 Tax Ct. Memo LEXIS 27; 30 T.C.M. (CCH) 1305; T.C.M. (RIA) 71305; November 30, 1971, Filed Stanley L. Drexler, 1107 Loman Bldg., Denver, Colo., for the petitioner. William O. Lynch, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax, as follows: Year
Deficiency
Addition to tax, sec. 6651(a), I.R.C. 1954
1961
$25,084.74
$6,549.13
1963
982.11
1964
330.58 The issues to be decided are: (1) Whether *29 respondent properly revoked petitioner's status as a social club exempt from tax; (2) If proper, whether the revocation in 1969 retroactive to 1961 was an abuse of respondent's power to revoke; (3) Whether amounts received by petitioner as special assessments from its members are income to petitioner or contributions to capital; and 1306 (4) Whether the penalty under section 6651(a)[1] for negligently failing to file income tax returns was properly imposed. Findings of Fact Some of the facts have been stipulated and are, together with the exhibits attached to the stipulation, incorporated herein by this reference. The petitioner is a corporation organized under the laws of the State of Colorado. No timely income tax or information returns were filed for the years in question. However, on December 7, 1966, petitioner filed information returns (Forms 990) for taxable years 1960 through 1965 with the district director of internal revenue, Denver, Colorado. At the time of filing the returns, as well as at the time of filing the petition in this case, petitioner maintained *30 as its principal place of business the facility located at 2100 Lake Avenue, Pueblo, Colorado. Petitioner's predecessor, the Minnequa University Club, an unincorporated social club, was founded by the Colorado Fuel and Iron Corporation in 1892, primarily for the use of the corporation's executives. In September 1927, petitioner was incorporated with the Articles of Incorporation stating the corporate purpose as follows: II. The particular business and object for which our said association is formed, shall be to promote good fellowship and social relations among ourselves and associates therein, and to have and maintain, in the City of Pueblo, in the County of Pueblo and State of Colorado, for the use of ourselves and said associates, for the purposes aforesaid, a club house with all the appurtenances and belongings, matters and things of a club and club house as usual thereto. In October 1927, the Colorado Fuel and Iron Company, together with the Colorado Realty Holding Company, transferred to petitioner a parcel of real estate situated adjacent to Lake Minnequa. The deed conveying the property contained the following restrictions: This indenture is executed and delivered *31 with the understanding that the demised premises will be used for Club purposes only; that in the event The Minnequa University Club, its successors or assigns, dissolves or uses the demised premises for any purpose other than as a Club, then in that event, the title to the premises herein demised shall revert to the parties of the first part, their successors or assigns; * * * At all times material herein, petitioner was a nonstock corporation with a membership of approximately 300 members. On July 6, 1928, respondent, by letter of that date, granted petitioner tax-exempt status as a social club under the predecessor of section 501(c)(7). Petitioner, as well as its predecessor, has at all times been located on the shore of Lake Minnequa. The club consists of a two-story clubhouse facility housing three dining rooms, a ballroom, two bars, and two kitchens. In addition, the club maintains a swimming pool and members are entitled to engage in various water sports and activities in Lake Minnequa. Sometime prior to 1961 the club began making its dining rooms and ballroom available to various civic and business organizations throughout the community for the purpose of holding meetings, *32 luncheons, dinners, and other similar functions. At the outset arrangements for holding gatherings of this nature were made through a club member. By 1961, however, this procedure had been dispensed with and those seeking use of petitioner's facilities made their arrangements directly with the club manager. Typical of the groups using the facility are the Rotary, Lions, Optimist, and Kiwanis Clubs as well as the Chamber of Commerce and the Policemen's Benevolent Association. Petitioner's records demonstrate that use of the club facilities for nonmember functions easily exceeded the number of times it was used for member functions. A breakdown of the records shows the following: Taxable
Nonmember
Member
Total
Year
Functions
Functions
Functions
1961
664
260
924
1962
694
251
945
1963
651
306
957
1964
658
346
1,004
1965
673
333
1,006
1966 589
289
878
3,929
1,785
5,714
Income generated by nonmember use of the club facilities constituted not less than 30 percent of petitioner's income from all sources in each of the years 1961 through 1966. 1307 In 1961 petitioner's board of directors determined that the club required *33 certain repairs, enlargements, and improvements. To finance the construction, a special assessment was levied on the club members. All of the approximately 300 regular members were assessed $198 each and the two out-of-town members were assessed $99 each. Members had the option to pay the special assessment in a lump sum or through an increase in their monthly dues over a period of five years. Petitioner set up a separate building fund account and all transactions involving funds from the special assessment were handled through this account. All of the funds derived from the special assessment were in fact expended for capital improvements. During the years in question, the special assessment produced revenues in the following amounts: 1961
$67,247.31
1963
23,994.00
1964
16,063.86
Memberships in petitioner were, for all practical purposes, not transferable, and upon termination of their membership for any reason whatsoever members were not entitled to any refund or rebate of membership fees, dues, or assessments. By letter dated March 6, 1969, respondent advised petitioner that commencing with the year 1961 petitioner was not operated exclusively for tax-exempt *34 purposes within the meaning of section 501(c)(7) and that its tax-exempt status was thereby revoked as of 1961. In addition, respondent concluded that amounts received by petitioner from the special assessment were taxable income resulting in the deficiencies here in question. Respondent also alleges negligence in petitioner's failure to file corporate income tax returns for the years in question. Opinion Petitioner first contends that it was, during the taxable years in question, an organization exempt from tax under the provisions of section 501. [2] Respondent maintains that petitioner derived a substantial amount of recurring income from outside sources and thereby removed itself from the section 501(c)(7) category and is therefore not exempt from tax. *35 To qualify for exemption, a social club must meet a two-pronged test. First, it must be operated exclusively for pleasure, recreation, and other nonprofitable purposes, and second, no part of its net earnings may inure to the benefit of its shareholders or members. The "exclusively * * * nonprofitable" operation requirement has been tempered somewhat by regulations and case law. The cases clearly permit generation of some income from nonmember sources so long as the activity generating such income is merely incidental and the income is either negligible or nonrecurring. See United States v. Fort Worth Club of Forth Worth, Texas, 345 F. 2d 52 (C.A. 5, 1965), and cases cited therein. Where outside income is both substantial and recurring, the statutory requirements are obviously not met and loss of tax-exempt status must result. Coastal Club, Inc., 43 T.C. 783 (1965), affd. per curiam 368 F. 2d 231 (C.A. 5, 1966); West Side Tennis Club v. Commissioner, 111 F. 2d 6 *36 (C.A. 2, 1940), affirming 39 B.T.A. 149 (1939). Particularly applicable to this case is section 1.501(c)(7)-1, Income Tax Regs., amplifying section 501(c)(7), which provides: § 1.501(c)(7)-1 Social clubs. (a) The exemption provided by section 501(a) for organizations described in section 501(c)(7) applies only to clubs which are organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, but does not apply to any club if any part of its net earnings inures to the benefit of any private shareholder. In general, this exemption extends to social and recreation clubs which are supported solely by membership fees, dues, and assessments. However, a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities. (b) A club which engages in business, such as making its social and recreational facilities available to the general public or by selling real estate, timber, or other products, is not organized *37 and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and is not exempt under section 501(a). Solicitation 1308 by advertisement or otherwise for public patronage of its facilities is prima facie evidence that the club is engaging in business and is not being operated exclusively for pleasure, recreation, or social purposes. However, an incidental sale of property will not deprive a club of its exemption. Not only must an organization be operated exclusively for nonprofit purposes but, in addition, no part of any net earnings may inure to the benefit of members. In order for net earnings to inure to the benefit of members, it is not necessary that any direct distribution be made. Aviation Club of Utah v. Commissioner, 162 F. 2d 984 (C.A. 10, 1947), affirming 7 T.C. 377 (1946). It is also noteworthy that in considering the concept of "net earnings" relative to outside income, it is necessary that the comparison be outside income in excess of the cost of producing the outside income and not merely the excess of overall receipts *38 over the expenses of the entire operation. Jockey Club v. Helvering, 76 F. 2d 597 (C.A. 2, 1935), affirming 30 B.T.A. 670 (1934). Petitioner, a nonstock social club, was originally organized for recreational and social purposes. The club facility located on Lake Minnequa and consisting of comfortable dining rooms, a ballroom, bars, and a swimming pool is ideal for providing the club's approximately 300 members both a social and recreational outlet. At some time during the decade preceding the years in question, petitioner discovered that its facilities were attractive for meeting purposes of various organizations, groups, events, and other civic affairs. Initially, outsiders had access to the club only when someone simultaneously belonging to an outside organization and the Minnequa University Club would arrange for his organization to utilize the dining, drinking, or meeting facilities. For years petitioner's building was the only facility in the community capable of seating and serving groups of any significant size. As time passed, more and more organizations, realizing the convenience and capacity of petitioner, sought to employ the building for meetings *39 and gatherings. Perhaps due in part to both inconvenience and impracticability, the practice of securing the club through a common member fell by the wayside and arrangements were thereafter made directly with the club manager. During the time span 1961-1966, the nonmember outside use of petitioner's facilities and the income generated thereby can hardly be characterized as insubstantial. Of the functions scheduled to take place at the club each year, over 60 percent were nonmember related functions. The volume of outside traffic becomes yet more graphic when viewed in terms of numbers. In each of the taxable years before us, i. e., 1961, 1963, and 1964, the club reservation records show the number of scheduled nonmember functions to be 664, 651, and 658, respectively. In other words, only infrequently did petitioner not have an average of two outside events scheduled each day of the year. The exact proportion of petitioner's income attributable to nonmember use is unavailable. Petitioner has never maintained its books in a manner that reveals an accurate breakdown. It has been stipulated, however, that income from nonmember use constituted at least 30 percent of petitioner's income *40 from all sources during each of the years in question. From the foregoing, we think it is obvious here, as did Judge Wisdom in Fort Worth Club of Fort Worth, Texas, supra, that "[we] are not talking about card fees from the gin game - in character or amount." In letting out its facilities to community organizations and nonmember individuals, petitioner was, in every practical sense, conducting a profitable business separate and apart from its nonprofit, recreational, and social activities. In conducting such a commercial enterprise, it is thrust into open competition with others in the community. To grant petitioner immunity from taxation would obviously confer upon it an unjust competitive advantage. Section 1.501(c)(7)-1, Income Tax Regs., requires that an organization, to warrant exemption, be "supported solely by membership fees, dues, and assessments." Clearly, petitioner is not so supported. This rule is made less stringent by case authority such as Fort Worth Club of Fort Worth, Texas, and cases cited therein which provide that limited *41 amounts of outside income will be tolerated if they are "(1) strictly incidental to club activities, not a result of an outside business, and (2) either negligible or nonrecurring." Fort Worth Club of Fort Worth, Texas, supra, at 57. This slight loosening of the statutory language is of no assistance to petitioner whose activities (1) constituted an outside business not incidental to its recreational and social functions and (2) were both substantial and recurring. Petitioner fails to conform to the statutory requirements in a second, and equally 1309 fatal, respect. The cost of providing services to outside groups was clearly less than the revenue produced. The resulting profits, or net earnings, when used to offset petitioner's other operating costs, permit the members to enjoy the petitioner's facility and services at a reduced, or at least a constantly maintained, price. The reduction in dues is, in our view, an inurement to the benefit of the members and alone is sufficient to disqualify petitioner from exempt status. Coastal Club, supra; Jockey Club v. Helvering, supra. Petitioner next asserts that respondent's notification of *42 March 6, 1969, retroactively revoking petitioner's tax exemption as of 1961 was improper. Section 7805(b) provides as follows: SEC. 7805. RULES AND REGULATIONS. (b) Retroactivity of Regulations or Rulings. - The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue las, shall be applied without retroactive effect. This has been interpreted as granting respondent the power to retroactively revoke as well as the discretionary power to limit the retroactive effect of rulings. Moreover, a retroactive ruling should not be disturbed absent a showing that respondent abused his discretion. Automobile Club v. Commissioner, 353 U.S. 180 (1957); Colombo Club, Inc., 54 T.C. 100 (1970), affd. - F. 2d - (C. A. 9, 1971). Petitioner's argument in this regard is short in length as well as substance, and is wholly without merit. Petitioner contends that since it was granted an exemption in 1928 and has made *43 no change of method of operation since that date, it is inequitable to allow retroactive revocation of its tax-exempt status. The evidence in this case makes it clear that petitioner's method of operation has either changed since 1928 to permit extensive outside use of its facilities or at the time of obtaining its exemption it made misstatements of fact as to the extent of outside use. The record indicates quite clearly that the former is the case and consequently petitioner's argument is without a foundation. Were the latter true, it would fare no better. Moreover, the record demonstrates that respondent's retroactive revocation was reasonable rather than abusive. Petitioner's failure to file the requisite information returns and thereby provide respondent with the facts necessary to determine the continuing propriety of petitioner's exempt status is, in our view, plausible grounds for the retroactive revocation. In 1961 petitioner initiated a program to repair and improve its building facility. To finance this construction, it was necessary to levy a special assessment on all of the members. The funds generated by the assessment were kept in a segregated bank account and treated *44 separately on petitioner's books. In short, they were earmarked for capital improvements from the time they were assessed until they were actually used for payment of construction costs. The special assessment could be paid by the members in a lump sum or in regular monthly installments. The latter were payable over three years. Total assessment received by petitioner in 1961, 1963, and 1964 were $67,247.31, $23,994.00, and $16,063.86, respectively. Respondent's position that the above amounts are taxable income is primarily based on two arguments. He focuses quite heavily first on the character of petitioner's membership, i.e., nonstock and essentially nontransferable. Second, he points to the clause in the deed under which petitioner holds its real estate and argues that the clause provides for reversion to the donor upon cessation of social club activities and therefore precludes the membership from receiving the only club assets of substantial value upon dissolution. Both of these arguments are, in turn, premised on the proposition that without the ability to transfer their membership and with no distribution (of real estate) upon dissolution, members of the club owned nothing *45 of a proprietary nature and therefore the special assessment must have been payment for services and constitutes income. While we do not necessarily agree with respondent's reasoning, we need not decide its merits, since our approach down a different path removes the premise on which it is founded. While petitioner is a nonstock corporation, its members are its only owners and must be put in the shoes of stockholders. In the normal situation, capital funds are often injected into operating businesses with the goal in mind of generating additional income and profits within the business. Contributions so made are nonetheless contributions to capital, and when made astutely often produce dividend income to the contributors. Where, as is the case 1310 here, the contributions to capital increases the business' physical plant, increasing business and generating additional profits, the income is no less realized by the stockholders because received in the form of reduced or maintained membership dues than if distributed as a dividend. This form of realizing a benefit from their contributions is every bit as real as realization from a membership transfer upon dissolution. Respondent's *46 conclusion that payments by petitioner's members could only have been for services received is fallacious and not to be relied on. That the assessed amounts were received by petitioner as contributions to its capital is clear. The terms of the assessment limited the use to be made of the funds. The funds were always maintained and accounted for separately; and, lastly, the funds were actually expended on capital expenditures. We therefore can only conclude that they were capital contributions. Respondent's reliance on James Hotel Company v. Commissioner, 325 F. 2d 280 (C.A. 10, 1963), affirming 39 T.C. 135 (1962), and Teleservice Co. of Wyoming Valley, 27 T.C. 722 (1957), affd. 254 F. 2d 105 (C.A. 3, 1958), is misplaced. Both cases are clearly distinguishable from the one at hand. In James Hotel Company, the Court of Appeals held that amounts paid to the corporation were not contributions to capital but, instead, were in the nature of an entrance or initiation fee to the newly-formed club. No such argument has been, or could realistically be, made here. In Teleservice Co. of Wyoming Valley, residents of a community were *47 unable to receive television service by conventional means. The taxpayer was formed for the purpose of providing television service via a cable system. Residents of the community were required to pay both a large initial sum as well as monthly fees. The initial sum was ostensibly to cover construction costs attributable to the recipient. The Court concluded that the sum was additional payment for the services to be received and therefore income to the taxpayer. The case is distinguishable on several factual grounds - not the least of which is the fact that the payers of the amounts involved therein were neither actual stockholders nor in the nature of stockholders but merely recipients of the taxpayer's services. It is also of importance to note that in both of the above cases reliance was placed on the absence of any restrictions or earmarking of the funds received. In our view, this alone serves as a basis on which to distinguish both cases from the one at bar. We are not unaware of certain language present in United States v. Fort Worth Club of Fort Worth, Texas, supra, supporting respondent's position. Therein the Court of Appeals said: "[The] club that loses *48 its exemption becomes taxable on income from all sources, including dues, assessments, and membership fees." This language, however, is not controlling here. It is dicta with regard to assessments, and we believe alludes only to assessments levied and used as general operating reveune. It was not meant to include special assessments that are capital contributions of the nature involved herein. Respondent has seen fit to impose an addition to tax under section 6651 (a)[3] for petitioner's failure to file corporate income tax returns after having been given due notice that such returns were necessary. The imposition is presumptively correct and in the absence of adequate proof to the contrary will be sustained. *49 Petitioner's only argument in its defense is that it believed respondent's revocation of its exempt status to be error. Such a belief, however sincere, is an insufficient reason for failing to file. Stevens Bros. Foundation, Inc., 39 T.C. 93 (1962), affd. in part and reversed in part on other grounds 324 F. 2d 633 (C.A. 8, 1963); West Side Tennis Club, supra.[4] Decision will be entered under Rule 50. 1311 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
2. SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC. (a) Exemption From Taxation. - An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504. * * * (c) List of Exempt Organizations. - The following organizations are referred to in subsection (a): * * * (7) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.↩
3. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In the case of failure to file any return * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. (b) Penalty Imposed on Net Amount Due. - For purposes of subsection (a), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed upon the return. Footnote 4 on next page.↩
4. By virtue of our conclusion on the capital contribution issue, it would appear that petitioner's negligence is moot. Without inclusion into income of the special assessment, no taxes are owing on which to levy the negligence penalty. The penalty imposed by sec. 6651(a)↩ is measured by a percentage (25 percent in this case) of the "amount required to be shown as tax" on the return; therefore, where no tax is owned no penalty exists.