### Appeal of LIBERTY LIGHT & POWER CO.

Docket No. 3760.   Submitted July 27, 1925.   Decided June 21, 1926.

In conformity with the statutes of the States of Indiana and Ohio, certain citizens desiring to obtain electric service constructed certain transmission lines at a cost of $10,500 and transferred the same to the taxpayer which was required, by statute and regulations of the Public Utilities Commission, thereafter to maintain said lines and to furnish electrical current to the subscribers to the cost of constructing said line, and, to such other subscribers for electrical service upon the payment of the cost of equipment necessary to make connection with said lines, at rates to be prescribed by the Public Utilities Commission. *Held*, that the transmission lines, which became the property of the taxpayer upon being transferred to it by the constructors, did not constitute taxable income within the meaning of the Sixteenth Amendment to the Constitution and the Revenue Act of 1921.

*John D. Van Wagoner, Esq.*, for the petitioner.
*M. N. Fisher, Esq.*, for the Commissioner.

Before James,[1] Littleton, Smith, and Trussell.

This is an appeal from the determination of a deficiency in income and profits tax in the amount of $2,770.40 for the calendar year 1921, arising from the decision of the Commissioner that certain property, consisting of rural electric power lines constructed and paid for by citizens of the States of Indiana and Ohio, which lines upon completion were conveyed to the taxpayer and became its property, constituted taxable income.

### FINDINGS OF FACT.

The taxpayer is an Indiana corporation with principal office at Richmond, engaged in the transportation and sale of electricity in Indiana and Ohio. It was subject to the rules and regulations prescribed by the Indiana and Ohio Public Utilities Commissions. The taxpayer was required to furnish all applicants within its territory, to the capacity of its facilities, with adequate service at just and reasonable rates. It was under no obligation to extend its service into territory which it had not entered and as to which it had assumed no franchise obligations.

Service could not be extended by the taxpayer to rural communities on a paying basis, and it was not required to do so except when transmission lines were constructed through contributions by prospective consumers. In the event residents of rural communities contributed an amount necessary to construct transmission lines, the taxpayer was required to receive and maintain such lines and furnish service at the rates prescribed by the Public Utilities Commission.

During the year 1921 the taxpayer became a party to four contracts entered into between certain individuals, designated as unit holders, and a constructor. These contracts provided for the construction, through contributions by the unit holders, of two rural transmission lines, one in Wayne County, Indiana, known as the Centerville Line, and the other in Ohio, known as the Campbellstown Line. The lines were completed and delivered to the taxpayer within the year 1921. The provisions of each of the contracts material to this appeal, except as to a variation in the amount to be contributed by each unit holder, were the same and were as follows:

Whereas, said Constructor is in position to and can upon suitable plans and specifications construct said line, and said Power Company is in position to render, continue and maintain electrical service thereby after completion, and shall and does further agree that upon the [sic] all of the said transmission line being conveyed to it to thereafter maintain the same suitable to provide therefor efficient and continuous service to the users of electric current along such line; and

---

[1] This decision was prepared during Mr. James' term of office.

Whereas, Unit Holders in order to encourage such construction, do and have agreed as hereinafter set forth, to provide part of the necessary funds by and with which to meet the costs of construction of such line, and do and have further agreed that upon completion of the same, same shall be and is the sole property of said Power Company,

Now, therefore, upon the premises, and for and in consideration of the mutual benefits to accrue to the parties hereto, it is by them respectively agreed and contracted as follows, to-wit:

(1) Said Constructor contracts and agrees that following the consummation of this agreement and contract by the Unit Holders as hereinafter set forth, he shall and will effect:

(a) The construction * * * · of a transmission line, * * *.

(2) Said Unit Holders each to constitute such fund as shall be necessary to be provided hereunder, individually and severally subscribe for and agree to pay for such number of units as may be set opposite their names respectively, the maximum of such liability per unit however being and to be the sum of Two Hundred Thirty-four and 25/100 Dollars ($234.25), and respective units payable on demand, fifty per cent thereof when material is delivered, and balance when line is completed. The maximum of aggregate units shall be the sum of an amount which equals the total lineal footage of transmission line at twelve and nine-tenths cents (12.9¢) per lineal foot therefor, or the sum of $681.81 per mile; and altho not herein finally definitely determined, estimated length is some five and one-half miles.

Such total cost of such unit at said price of twelve and nine-tenths cents (12.9¢) per ft. shall be and is a contribution made by the Unit Holders to encourage the construction of such line. As paid in and as accumulated, same shall be and is a contribution upon and as an inducement the construction of such transmission line, and payment being made and gross sum paid to Constructor, Unit Holders have and claim no further right, title and interest in and to such transmission line.

(3) Said The Liberty Light and Power Company as inducement to this contract and agreement, contracts and agrees that upon the completion of such transmission line, it shall and will at the Northern terminus thereof make due, proper and suitable connection with its power line, and then and thereafter and continuously afford proper and reasonable service by and through such transmission and power lines.

Said The Liberty Light and Power Company further contracts and agrees that it shall and will accept said line from said Constructor as completed, and shall and will further thereafterwards maintain the same in condition proper in the premises, and without further cost or charge for such maintenance to either said Constructor or to said Unit Holders; it being always however understood that should said The Liberty Light and Power Company desire or determine to render service to others than Unit Holders, or to make extensions to said transmission line, it shall be and always is entitled so to do, conditioned always however that such additions and extensions shall not be calculated to render to Unit Holders as may be consumers of current less efficient service by reason of such additions and extensions.

The unit holders contributed a total sum of $10,500, and the taxpayer contributed $739.98 in cash and equipment of the value of $1,026.77 toward the construction of the Centerville Line, and equipment of the value of $2,482.60 toward the construction of the Campbellstown Line. Upon completion the transmission lines were turned

over to the taxpayer and became its property. Their value was entered as an asset in its plant account and as a liability in its balance sheet account " Donations in Aid of Construction."

The Principles and Regulations of the Indiana Public Utilities Commission covering extension of facilities to supply rural electric service provides as follows:

The term "Rural Customer" as herein used refers to the consumer of electrical energy who is located outside of the corporate limits of any city or village or beyond the limits of the local distribution system of any city or village when the same extends beyond the actual corporate limits.

The term "Rural Extension" relates to extensions made primarily to serve rural customers.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The customers to be served from any rural extension shall collectively deposit with the company an amount equal to the estimated cost of the general equipment to be furnished and, in addition thereto, each individual customer shall deposit with the company the estimated cost of the local equipment necessary to serve him. The customers to be served shall allocate the distribution of costs of general equipment among themselves.

Upon the deposit of the funds provided for in the preceding paragraph, the construction work will be completed and service supplied as soon as practicable.

Notwithstanding any payments made by customers to the company covering the cost of general or local equipment the title to the same shall be and remain in the company.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The rates for rural service shall be the sum of the regular rates for any class of service as supplied to customers in municipality, suburb or village from which the extension is made, including all minimum and demand charges, and any difference of opinion in the application of this schedule shall be submitted to this Commission for interpretation.

And, in addition thereto, a rural charge, which, upon the annual basis, shall be equal to ten per cent of the total cost of the general and local equipment included in each separate extension.

The annual charge will be prorated to each customer served from each rural extension, in proportion to the transformer capacity provided for his use based upon the application for service made by him.

The annual rural charge applicable to each customer shall be payable in monthly installments as nearly equal as may be, for the period covered by each customer's application and or so long as such rural charge shall remain on file with the Public Service Commission of Indiana.

Payment of the rural charge is not based or contingent upon the use of energy during any month or longer period but will be required in addition to any minimum included in the municipal rate upon which the charge for energy is based and is compensation for the excess cost of serving rural customers.

Accounting procedure to be followed when any part of the property or plant of any public utility is paid for by the patrons or consumers:

In the instance when any additions, extensions, improvements or betterments to the property or plant of any public utility are paid for by the patrons thereof, the ownership of which passes to the utility, such as the rural extensions covered by the foregoing, the following accounting procedure shall be followed.

Cash shall be charged with amount of money so paid in by said patrons and a balance sheet (liability) account "Donations in Aid of Construction" shall be concurrently credited.  As the work of construction progresses, the proper capital account of the utility shall be charged and the cash account (or accounts payable) concurrently credited.

NOTE.—If the addition, extension, improvement, or betterments are first constructed by the patrons and then given to the ownership of the utility, the proper capital account shall be charged and the balance sheet (liability) account "Donations in Aid of Construction" shall be concurrently credited with the actual cost (estimated if not known) of said property.

Said balance sheet account "Donations in Aid of Construction" shall be carried permanently and all entries to said account shall be made with sufficient clarity and detail so that the analysis thereof, which will be called for by the Commission, may be readily obtainable.

Upon the audit of the return the Commissioner held that the property received by the taxpayer constituted taxable income within that year to the extent of $10,500 contributed by the unit holders.

OPINION.

LITTLETON : The issue presented in this appeal is similar to that before the court in the case of *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 628, and is whether certain electric power lines constructed by the citizens of Indiana and Ohio and transferred upon completion to the taxpayer, becoming its property under the provisions of the statutes of Indiana and Ohio, constituted taxable income within the meaning of the Sixteenth Amendment to the Constitution and the Revenue Act of 1921.

The question of what constitutes income within the meaning of the Sixteenth Amendment and the various revenue acts has been considered and decided by the courts in a number of cases, in which the courts have given the word "income" a settled and definite meaning.

The Board is without information from the Commissioner as to the theory upon which he predicated his decision that this property constituted taxable income.  We presume that his reason for holding it to be taxable income was that the taxpayer became the owner thereof without cost to it, or, that it constituted an advance payment by the citizens for services to be rendered in the future by the taxpayer.  The facts show, however, that the citizens who constructed and transferred these lines to the taxpayer were required, by statute and regulations prescribed by the Public Utilities Commissions of Indiana and Ohio, to pay for electricity furnished by the taxpayer at the regular rates paid by consumers in municipalities who contributed nothing toward the construction of the taxpayer's lines over which such service was furnished, plus an additional rural charge.

The most that can be said in respect of these transmission lines is that they were contributed by the citizens to the capital of the taxpayer. They were certainly not payments for services rendered or to be rendered.

In the case of *Southern Pacific Co.* v. *Lowe*, 238 Fed. 847, the court said, at page 850:

I do not think that "income," as used in the statute, [Income Tax Act October 3, 1913] should be given a meaning so as to include everything that comes in. The true function of the words "gains" and "profits" is to limit the meaning of the word "income" and to show its use only in the sense of receipts which constituted an accretion to capital. So the function of the word "income" should be to limit the meaning of the words "gains" and "profits." The increased value of capital as such constitutes in one sense a gain or profit, but not income. Hence such gain or profit is not taxable, but only such profits and gains as constitute income are taxable. This in substance was what the court held in *Gray* v. *Darlington*, 15 Wall. 63, 21 L. Ed. 45, and in *Gauley Mt. Coal Co.* v. *Hays*, 230 Fed. 110, 144 C. C. A. 408.

In the early case of *People* v. *Davenport*, 30 Hun (N. Y.) 177, it was said that "income is that which capital earns remaining itself intact." This definition was recently adopted in *Mitchell* v. *Doyle* (D. C.) 225 Fed. 437.

In the case of *Stratton's Independence, Ltd.* v. *Howbert*, 231 U. S. 399, the court, at page 415, said:

And, however the operation shall be described, the transaction is indubitably "business" within the fair meaning of the act of 1909; and the gains derived from it are properly and strictly the income from that business; for "income" may be defined as the gain derived from capital, from labor, or from both combined, and here we have combined operations of capital and labor.

In the case of *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179, the court said, at page 185:

Whatever difficulty there may be about a precise and scientific definition of "income," it imports, as used here, [Act of August 5, 1909] something entirely distinct from principal or capital either as a subject of taxation or as a measure of the tax; conveying rather the idea of gain or increase arising from corporate activities. As was said in *Stratton's Independence* v. *Howbert*, 231, U. S. 399, 415 [34 Sup. Ct. 136, 58 L. Ed. 285]: "Income may be defined as the gain derived from capital, from labor, or from both combined."

In the case of *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, under the Act of October 3, 1913, the court said:

We must reject in this case, as we have rejected in cases arising under the Corporation Excise Tax Act of 1909 (*Doyle* v. *Mitchell Brothers Co.*, [247 U. S. 179, 38 Sup. Ct. 467, 62 L. Ed. 1054] and *Hays* v. *Gauley Mountain Coal Co.*, [247 U. S. 189, 38 Sup. Ct. 470, 62 L. Ed. 1061, decided March 20, 1918]) the broad contention submitted in behalf of the Government that all receipts— everything that comes in—are income within the proper definition of the term "gross income," * * *. Certainly the term "income" has no broader

meaning in the 1913 Act than in that of 1909 (see *Stratton's Independence* v. *Howbert*, 231 U. S. 399, 416, 417 [34 Sup. Ct. 136, 58 L. Ed. 285]), and for the present purpose we assume there is no difference in its meaning as used in the two acts.

In *Eisner* v. *Macomber*, 252 U. S. 189, in considering the scope of the word "income," as used in the Sixteenth Amendment and the Revenue Act of September 8, 1916, the court said, at pages 206–208:

In order, therefore, that the clauses cited from Article I of the Constitution may have proper force and effect, save only as modified by the Amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not "income," as the term is there used; and to apply the distinction, as cases arise, according to truth and substance, without regard to form. Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.

The fundamental relation of "capital" to "income" has been much discussed by economists, the former being likened to the tree or the land, the latter to the fruit or the crop; the former depicted as a reservoir supplied from springs, the latter as the outlet stream, to be measured by its flow during a period of time. For the present purpose we require only a clear definition of the term "income," as used in common speech, in order to determine its meaning in the Amendment; and, having formed also a correct judgment as to the nature of a stock dividend, we shall find it easy to decide the matter at issue.

After examining dictionaries in common use (Bouv. L. D.; Standard Dict.; Webster's Internat. Dict.; Century Dict.), we find little to add to the succinct definition adopted in two cases arising under the Corporation Tax Act of 1909 (*Stratton's Independence* v. *Howbert*, 231 U. S. 399, 415; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 185)—"Income may be defined as the gain derived from capital, from labor, or from both combined," provided it be understood to include profit gained through a sale or conversion of capital assets, to which it was applied in the *Doyle Case* (pp. 183, 185).

Brief as it is, it indicates the characteristic and distinguishing attribute of income essential for a correct solution of the present controversy. The Government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word "gain," which was extended to include a variety of meanings; while the significance of the next three words was either overlooked or misconceived. "*Derived—from—capital*";—"the *gain—derived—from—capital*," etc. Here we have the essential matter; *not* a gain *accruing* to capital, not a *growth*, or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital however invested or employed, and *coming in*, being "*derived*," that is, *received* or *drawn by* the recipient (the taxpayer) for his *separate* use, benefit and disposal;—*that* is income derived from property. Nothing else answers the description.

The same fundamental conception is clearly set forth in the Sixteenth Amendment—"incomes, *from* whatever *source derived*"—the essential thought being expressed with a conciseness and lucidity entirely in harmony with the form and style of the Constitution.

50144°—27——14

This definition was followed in the case of *United States* v. *Phellis*, 257 U. S. 156, and *Weiss* v. *Stearn*, 265 U. S. 242; *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170.

In the case of *Cuba R. R. Co.* v. *Edwards*, 298 Fed. 664, which involved a tax for the years 1911 to 1916, inclusive, the District Court for the Southern District of New York stated, in respect to the question whether contributions by the Government of Cuba constituted income to the Railroad Company, at pages 665 and 666, as follows:

The question is whether the installments paid by the Cuban government were principal or income. Certainly they would not seem to be income in the ordinary sense. It is true that the first line of railroad had to be and was completed by the company before the subsidies were paid, and in the case of both lines there was something to be done on the part of the railroad *in futuro* by the terms of the contract. But can the subsidies be regarded in any proper sense as gains derived from capital or labor? *Stratton's Independence, Ltd.*, v. *Howbert*, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. 285.

The fixing of rates is certainly a common provision in government contracts granting railroad franchises, and the real consideration for the payment of the subsidy was the agreement to build the road and operate it. For that agreement a franchise to operate it on prescribed terms and a subsidy payable in six annual installments was granted. Suppose a subscriber for stock agreed to pay in his subscription in six annual installments after a railroad was completed. The subscriber's return would consist of a chance to receive dividends in the future. The government's return in this case was to be secured by the development of the island through the construction and operation of the railroad, the privilege on the part of the government of placing telegraph and telephone wires on the right of way, and of securing the carriage of mails and passengers, produce, and troops upon prescribed terms. The fixing of rates is apparently a proper subject of government regulation. Would a subscription to stock be income because payable after the railroad was completed? I cannot see the merit of such a contention. The purpose seems clear to add to the funds of the railroad company, doubtless for the purpose of providing equipment or repaying obligations incurred in construction. Whatever the purpose of the subsidies, they in no way resemble earnings. They have but the remotest resemblance to a gain from either capital or labor.

The English cases, where annual contributions were made to assist in paying interest charges on construction bonds, are not in point. Such subsidies have been fairly held to be income, because they were intended to relieve the companies from annual charges against income. So far as annual subsidies were required to be used to form a sinking fund to amortize obligations incurred in construction, I think that the English decisions are of doubtful correctness. They are defended in respect to the items to be applied toward a sinking fund upon the ground that the whole sum making up the annual subsidy was paid as income, and that the appropriation of a portion of it to a sinking fund after receipt by the company did not alter its original character. The court said in the case of *Blake* v. *Imperial Brazilian Ry.*, Great Britain Reports of Income Tax Cases (1884) vol. 2, p. 58:

" When once the thing is ascertained as being subject to income tax, it matters not what is done with it afterwards. When once it has come within the grasp of the income tax acts, it is liable to income tax, whatever may be its destination, or whatever use it may be put to."

Whether the above reasoning be sound or not, no such situation confronts us here, for the payments are not derived from capital and labor, and are not to relieve annual interest charges against capital, but are contributions made within a short period to pay the railroad for constructing its lines and agreeing to run them on prescribed terms. I cannot see how the subsidies are income in any practical business sense.

This decision was affirmed by the Supreme Court in the case of *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 628, in which the court said, at page 631:

Defendant [collector] insists that the subsidies were merely payments in advance on account of transportation service, later to be performed by the plaintiff for the government, and therefore are to be deemed income and taxable as such.

In respect of these subsidy payments, the meaning of "income" as used in the Corporation Excise Tax Law of 1909 is not to be distinguished from the meaning of the same word as used in the Income Tax Law of 1913 and the Revenue Act of 1916. *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509, 518-519.

The Sixteenth Amendment, like other laws authorizing or imposing taxes, is to be taken as written and is not to be extended beyond the meaning clearly indicated by the language used. The Cuban laws and contracts are similar to legislation and arrangements for the promotion of railroad construction which have been well known in the United States for more than half a century. Such aids, gifts and grants from the government, subordinate political subdivisions or private sources—whether of land, other property, credit or money—in order to induce construction and operation of railroads for the service of the public are not given as mere gratuities. *Burke* v. *Southern Pacific R. R. Co.*, 234 U. S. 669, 679; *Louisville & Nashville R. R.* v. *United States*, 267 U. S. 395. Usually they are given to promote settlement and to provide for the development of the resources in the territory to be served. The things so sought to be attained in the public interest are numerous and varied. There is no support for the view that the Cuban Government gave the subsidy payments, lands, buildings, railroad construction and equipment merely to obtain the specified concessions in respect of rates for government transportation. Other rates were considered. By the first contract, plaintiff agreed to reduce fares for first class passengers and by the second, it agreed to reduce the rates on small produce. Clearly, the value of the lands and other physical property handed over to aid plaintiff in the completion of the railroad from Casilda to Placetas del Sur was not taxable income. These were to be used directly to complete the undertaking. The Commisioner of Internal Revenue in levying the tax did not include their value as income, and defendant does not claim that it was income. Relying on the contract for partial reimbursement, plaintiff found the money necessary to construct the railroad. The subsidy payments were proportionate to mileage completed; and this indicates a purpose to reimburse

plaintiff for capital expenditures. All—the physical properties and the money subsidies—were given for the same purposes. It cannot reasonably be held that one was contribution to capital assets, and that the other was profit, gain or income. Neither the laws nor the contracts indicate that the money subsidies were to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income. The subsidy payments taxed were not made for services rendered or to be rendered. They were not profits or gains from the use or operation of the railroad, and do not constitute income within the meaning of the Sixteenth Amendment. See *Stratton's Independence* v. *Howbert*, 231 U. S. 399, 415; *Eisner* v. *Macomber*, 252 U. S. 189, 207; *Merchants' Loan & Trust Co.* v. *Smietanka, supra.*

Upon the facts in this appeal, and in the light of the foregoing decisions, the Board is of the opinion that the power lines constructed by the citizens of Indiana and Ohio and transferred to the taxpayer can not be held to have constituted taxable income for the calendar year 1921.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*

GREEN concurs in the result only.

STERNHAGEN, dissenting: It seems to me that the taxpayer, a commercial corporation, in the course of carrying on its business, and as one of the recognized features of its business, received compensation by way of consideration for a contract to perform its ordinary service. There was nothing altruistic in the motive which prompted these prospective customers to finance the extension. They needed service and they were willing to pay for it. If the facilities had been already constructed and available they would have paid a price embodied in the rate, and this would unquestionably have been within the company's gross income. Since the facilities were not available the company could only be induced to give service by the receipt of something in addition to the rate, namely, contributions sufficient to enable it to construct and furnish both facilities and service. Whatever it received in this way seems to me to be within its gross income from carrying on its business.

I do not understand the *Cuba Railroad* decision to hold contrariwise. That was a subsidy contributed by the sovereign, and I can not believe that the court intended it to be inferred that a private contribution made in consideration for the performance of one of the corporation's normal business functions was to be likewise free from tax. Furthermore, I had understood that the reasoning of this Board in the decision of the *Appeal of S. E. Overton Co.*, 2 B. T. A. 1160, proceeded upon the view that such an amount contributed by a municipality for the construction of a taxpayer's plant was income.