EPCO, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
EPCO, Inc. v. Commissioner
Docket No. 25248-93
United States Tax Court
T.C. Memo 1995-249; 1995 Tax Ct. Memo LEXIS 251; 69 T.C.M. (CCH) 2829; T.C.M. (RIA) 95249; June 12, 1995, Filed *251 Decision will be entered for respondent For petitioner: Juan D. Keller, Paul P. Weil, and Philip B. Wright. For respondent: James A. Kutten
GOLDBERG
GOLDBERG
MEMORANDUM FINDINGS OF FACT AND OPINION GOLDBERG, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1] Respondent determined a deficiency in petitioner's 1989 Federal income tax in the amount of $ 4,537. After concessions by petitioner, [2] the issues for decision are: (1) Whether funds received by a member of petitioner's consolidated group in connection with construction of a sewer extension are excludable from income as a contribution to capital; and (2) if the funds are not excludable, whether the recipient must include in income the amount of the funds. *252 Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of filing the petition, petitioner's principal place of business was Sunset Hills, Missouri. FINDINGS OF FACT Petitioner is an affiliated group of corporations which filed a consolidated Federal income tax return for 1989. For the year at issue, Epco, Inc. (Epco), a Missouri corporation, was the common parent of the affiliated group which includes Imperial Utility Corp. (Imperial) and House Springs Sewer Co. (House Springs), both Missouri corporations 100 percent owned by Epco. Eugene Fribis (Fribis) and Pamela Fribis owned all of the stock of Epco. Fribis was the president of Epco, Imperial and House Springs. Imperial was engaged in the business of sewage collection and treatment and was regulated by the Missouri Public Service Commission (PSC). In 1989, Imperial was classified as a class B sewer public utility. Fribis has a bachelor's degree in civil engineering from the University of Missouri in Columbia, Missouri, and a master's degree in civil engineering from the University of Missouri at Raleigh. He has been *253 working as a civil engineer since 1972, initially in the areas of site development, highway design work, and storm and sanitary sewer design. In 1979, Fribis began to specialize in wastewater engineering and sewage treatment. Sometime in 1986 or on 1987, Brooks McArthy (McArthy), a real estate developer, planned to develop a trailer park on a tract of land that he owned which was to be called Brookshire Village Mobile Home Park (Brookshire). Brookshire was originally planned for 266 trailer pads to be developed in three stages. A trailer pad is a concrete pad that supports and braces a mobile home, serving as the mobile home's foundation. Brookshire is located about 2-1/2 miles south of the Country Club Manor sewage treatment facility operated by Imperial and located on Rock Creek. The northern boundary of Brookshire abuts a tract of undeveloped land owned by Interstate Development Corp. (Interstate). The southern and eastern boundaries of Brookshire are located at the top of a ridge that divides two watersheds. Rainfall on the south and east sides of the ridge drains into the Heads Creek watershed. Rainfall on the Brookshire side drains into the Rock Creek watershed. In *254 1986 or 1987, McArthy approached Fribis, in Fribis' capacity as an engineering consultant, concerning designing Brookshire, which entailed grading the land and deciding the location of streets, storm sewers, and sanitary sewers. At the time of the planned construction, Brookshire did not have access to an existing sanitary sewer system, and McArthy was required to obtain sewer service for Brookshire before commencing development. The method of providing sewer service had to be approved by the Missouri Department of Natural Resources (DNR), which is an agency of the State of Missouri having responsibility to assure water quality in the State. Fribis informed McArthy that the wastewater and sewage from Brookshire could be treated using either an on-site lagoon, an on-site sewage treatment plant, or an underground sewage pipe extension to a centralized treatment plant (main-line extension). An on-site lagoon is an open air collection pond which utilizes microorganisms to treat sewage. The sewage remains in the lagoon for 45 to 150 days to allow the bacteria and algae to degrade the sewage to a stable end-product before it is discharged directly into a stream or tributary. An on-site *255 lagoon, which would have occupied 3 to 5 acres of property, would have been too large to locate on the tract of land which McArthy planned to develop, and thus only could have been constructed using the adjacent tract of land owned by Interstate. Neither Fribis nor McArthy discussed with Jack Sutton, the owner of Interstate, the possibility of constructing a lagoon on the adjacent tract of land. [3]
An on-site treatment plant is a mechanical device housed in a concrete or steel chamber having compartments, or basins, for aeration and clarification of the sewage. Typically, the incoming sewage is aerated in the first basin using positive displacement blowers. The sewage is transferred to the second basin, where it remains until the sludge settles to the bottom. The clear liquid on top is then discharged into a creek or stream, and the sludge is moved to the first *256 basin to assist the breakdown of incoming sewage. An on-site treatment plant requires approximately one-half acre of ground and would have been located at Brookshire. Both a lagoon and an on-site treatment plant would have discharged approximately 62,000 gallons of tertiary effluent per day into an unnamed tributary 2-1/2 miles upstream from the point at which it flows into Rock Creek. The stream, which passes by preschool playgrounds, fishing lakes, homes, churches, and schools, is defined as a "losing stream" by the DNR. A "losing stream" travels over porous subsurface allowing some of the stream flow to pass through the streambed to underground water. Therefore, discharge into a losing stream may seep through the ground into the groundwater and contaminate the drinking supply. Unless there is no other practical alternative, the DNR discourages the discharge of effluent by on-site facilities into a losing stream. According to the effluent regulations, the effluent discharged from an on-site treatment plant would be required to be two to three times cleaner than the requirement for the centralized treatment plant. Because the lagoon would have discharged effluent into a losing *257 stream, the DNR would have required supplemental aeration to enhance oxygen transfer and tertiary treatment by supplemental filter. The aeration process used for on-site facilities is noisy and causes the emission of odors. The cost to construct the lagoon would have been $ 150,000, but it was anticipated that there would be relatively little additional maintenance cost. Initially, an on-site plant would have cost approximately $ 100,000, but considering the maintenance costs, the cost would become comparable to the cost for the lagoon. The third possibility, the method ultimately chosen, involves constructing a main-line extension to an existing centralized treatment plant. The centralized treatment plant receives wastewater effluent from multiple real estate developments through an extensive system of collection lines. The effluent flows with gravity or is pumped at mechanical pump stations along the line toward the plant. Treating the sewage from Brookshire at a centralized treatment plant required the construction of sewer pipes and expansion of the Country Club Manor sewage facility to handle the additional inflow of sewage. The wastewater would flow to Country Club Manor *258 and be treated there before being discharged into Rock Creek. Rock Creek is a gaining stream at parts and a losing stream at other parts. In a gaining stream, water flow increases as it proceeds downstream. Centralized treatment plants like Country Club Manor are not permitted by the DNR to discharge into losing streams, and a gaining stream generally is preferable to a losing stream as a destination for any sewage discharge. The total cost of construction to hook up Brookshire to Country Club Manor was $ 540,000. The DNR would have permitted McArthy to use any of the three collection and treatment methods proposed by Fribis for Brookshire. The DNR, however, generally prefers sewage to be treated at a centralized facility rather than at an on-site treatment plant because a centralized facility produces a more uniform effluent and its effluent has less probability of contaminating the groundwater supplies. Regardless of the method of treatment chosen, the PSC, which regulates the rates charged by sewer companies, approved a tariff for Imperial requiring customers to pay a uniform tariff rate for sewage treatment. Therefore, because of the uniform rate, each of the three methods *259 would have generated approximately the same revenue stream to Imperial, except that the main-line extension allowed for potential to add customers. [4]
The tariff provided for a $ 400 "contribution in aid of construction fee" and a monthly service charge of $ 18 for each mobile home in Brookshire. [5] The $ 400 fee was a one-time fee charged to occupied mobile home pads, regardless of the existence of a sewer line. According to the General Rules and Regulations Applying to Sewer Service (Sewer Service Rules), Imperial was permitted to charge the customer for the cost of a sewer extension from the customer's property to the treatment plant and the cost of expanding the treatment plant to meet the enlarged flow. *260 Eventually, after consideration of input from the DNR, the parties decided to construct a main-line extension and expand Country Club Manor. On March 11, 1988, Imperial entered into a contract entitled "Agreement for Sewer Service New Construction" with McArthy and Interstate. [6] *261 Pursuant to the agreement, Imperial agreed to build a 2-1/2 mile underground wastewater collection pipe extending from Country Club Manor through the property owned by Interstate to Brookshire, allowing service to both properties. The contract provides for McArthy to pay Imperial $ 200,000 in "tap-on fees in accordance with the Sewer Company's tariff on file with the Missouri Public Service Commission". The contract also provides the following: 10. That for and in consideration of the Owner's actual contribution toward the construction of the off-site sewer extension, the Sewer Company shall credit to the Owner's tap-on fee account an amount equal to said Owner's actual contribution. * * * [7]
According to the contract with Imperial, McArthy deposited the $ 200,000 in an interest-bearing checking account in the names of McArthy and Imperial at Lemay Bank & Trust Co. The account bore McArthy's Social Security number as the taxpayer identification number, and interest earned on the account was paid to McArthy. Funds could be withdrawn from the bank by checks signed by both Fribis, as president of Imperial, and McArthy. In addition, McArthy and Interstate entered into an agreement providing that $ 100,000 of McArthy's deposit was for the development contemplated by Interstate, with the understanding that Interstate would later reimburse McArthy. Pursuant to the agreement, Interstate executed a deed *262 of trust in the amount of $ 100,000 in favor of McArthy. Subsequently, Interstate paid McArthy the $ 100,000 pursuant to their agreement. Imperial contracted with McClanahan Contracting, a partnership of which Fribis was a partner, to install the sewer main-line extension and expand the Country Club Manor sewage treatment plant at a total cost of $ 540,000. The cost of extending the main-line from the treatment plant to the Park was $ 350,000. Imperial paid approximately $ 150,000 of those construction costs, and the remainder consisted of the $ 200,000 funds from the escrow account. The expansion of Country Club Manor cost $ 190,000. [8]
As the contract provided, the deposit in escrow was credited toward the $ 400 per pad "contribution in aid of construction fee" permitted by the *263 Sewer Service Rules. As a result, Imperial did not charge McArthy a physical connection fee, which is usually borne by the customer, to connect individual mobile homes to the sewer system. The sewer lines within Brookshire were constructed at McArthy's expense, and he retained title to the lines and responsibility for their maintenance. Imperial owns the sewer line extension, which now serves customers other than those in Brookshire and from whom Imperial also receives fees. The annual service revenues actually generated from service to Brookshire are as follows: Approximate Pads Rented
Revenues
1988
10
$ 796
1989
20
4,040
1990
40
8,082
1991
45
9,243
1992
55
10,590
1993
70
11,846
1994 (to date)
95
14,858
The annual revenues generated from additional connections to the main-line extension are as follows: Cumulative Customers
Revenues
1988
3
$ 338
1989
6
2,310
1990
6
1,627
1991
7
1,718
1992
9
2,307
1993
12
3,415
1994 (to date)
12
3,393
Of the $ 200,000 deposited in the escrow account, $ 164,375 was disbursed in 1988 and $ 35,625 was disbursed in 1989. On its 1989 Federal income tax return, petitioner did not include as income *264 the $ 35,625 in disbursements from the escrow account during 1989 and did not claim depreciation in connection with those disbursements. [9]
OPINION Gross income means all income from whatever source derived, unless an exception applies. Sec. 61(a). Section 118(a) provides that "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." A "'contribution to the capital of the taxpayer' does not include any contribution in aid of construction or any other contribution as a customer or potential customer." Sec. 118(b). Before the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, section 118(b) specifically permitted contributions in aid of construction to be excluded from income. In the TRA 86, section 118 was amended to exclude *265 contributions in aid of construction from the definition of contribution to capital of a corporation. TRA 86 sec. 824(a), 100 Stat. 2374. The amendment is effective generally for amounts received after 1986. The legislative history of the TRA 86 reveals that Congress intended that "all payments that are made to a utility either to encourage, or as a prerequisite for, the provision of services should be treated as income of the utility and not as a contribution to the capital of the utility." H. Rept. 99-426, at 643 (1985), 1986-3 C.B. (Vol. 2) 1, 643. The House Ways and Means Committee report further states the following: Where all members of a particular group make transfers of property to the utility, normally it will be assumed that such transfers are to encourage the provision of services, despite the absence of any formal policy requiring such transfers, unless it is clearly shown that the benefit of the public as a whole was the primary motivating factor in the transfers. [Id. at 644, 1986-3 C.B. (Vol. 2) at 644.]
Petitioner seizes upon a portion of the latter language and claims that the contribution by McArthy, which was designated *266 interchangeably as a "tap-on fee" or "contribution in aid of construction", is not a contribution in aid of construction within the meaning of section 118(b) but a nontaxable contribution to the capital of Imperial because the construction of the sewer system benefited the public as a whole. Alternatively, petitioner contends that if the payment is determined to be a "contribution in aid of construction", including such amount in the income of a corporation would violate the Sixteenth Amendment. Respondent argues that the payment to Imperial is a "contribution in aid of construction" which is includable in income under sections 61 and 118. A review of the development of the tax law with regard to nonshareholder contributions is relevant to understanding the meaning of the terms "contribution to capital" and "contribution in aid of construction". In 1925, the Supreme Court was presented with the issue of whether subsidy payments from the Republic of Cuba for the construction and maintenance of railroad lines in Cuba constituted taxable income to the taxpayer corporation. Edwards v. Cuba R.R., 268 U.S. 628 (1925). Noting that such payments were not *267 given as gratuities but were provided to induce the construction and operation of railroads to serve the public at large, id. at 632, the Supreme Court held that the payments were "not made for services rendered or to be rendered", "were not profits or gains from the use or operation of the railroad", and, thus, did "not constitute income within the meaning of the Sixteenth Amendment", id. at 633. In 1926, this Court, following the rationale of Edwards v. Cuba R.R., supra, stated that "power lines constructed by the citizens of Indiana and Ohio and transferred to the taxpayer can not be held to have constituted taxable income". Liberty Light & Power Co. v. Commissioner, 4 B.T.A. 155, 164 (1926). We emphasized that the citizens who bore the cost of construction were required to pay the same electrical rates as those citizens in urban areas who incurred no such cost, and thus such costs of construction "were certainly not payments for services rendered or to be rendered." Id. at 159-160. The rationale of Edwards v. Cuba R.R., supra, *268 and Liberty Light & Power Co. v. Commissioner, supra, was followed in the ensuing years. See Great N. Ry. v. Commissioner, 8 B.T.A. 225 (1927), affd. 40 F.2d 372 (8th Cir. 1930); Texas & Pac. Ry. v. Commissioner, 9 B.T.A. 365 (1927); Rio Elec. Co. v. Commissioner, 9 B.T.A. 1332 (1928); Wisconsin Hydro-Elec. Co. v. Commissioner, 10 B.T.A. 933 (1928); Tampa Elec. Co. v. Commissioner, 12 B.T.A. 1002 (1928); Midland Valley Ry. Co. v. Commissioner, 19 B.T.A. 423 (1930), affd. 57 F.2d 1042 (10th Cir. 1932); Texas & Pac. Ry. v. United States, 72 Ct. Cl. 629, 52 F.2d 1040 (Ct. Cl. 1931), affd. 286 U.S. 285 (1932). In Detroit Edison Co. v. Commissioner, 319 U.S. 98 (1943), payments were received by an electric company to extend its facilities to provide services to a group of customers. The cost to the company of extending *269 its facilities was greater than the revenues expected from serving the additional customers, and the electric company required the customers to pay the estimated cost of the construction. Id. at 99. The Supreme Court noted that the payments were neither appropriated nor earmarked to the particular construction project but went into the company's general working funds. Id. at 100. The Court reasoned that "It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company." Id. at 102. The Supreme Court concluded that the taxpayer could not include the cost attributable to payments from customers in calculating basis for depreciation because the payments were not contributions to capital but "were to the customer the price of the service." Id. at 103. In 1950, the Supreme Court, in Brown Shoe v. Commissioner, 339 U.S. 583 (1950), held that payments by community groups to induce a company to locate or expand manufacturing *270 facilities in a community constituted contributions to capital. In so doing, the Supreme Court distinguished Detroit Edison Co. v. Commissioner, supra, by stating the following: Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company. [Brown Shoe v. Commissioner, supra at 591; fn. ref. omitted.]
Four years later, Congress added section 118 to the Internal Revenue Code of 1954 to codify existing case law concerning non-shareholder contributions to capital of a corporation. Section 118 provided that gross income does not include contributions to the capital of a corporation. The House Committee report described the provision *271 as follows: This in effect places in the code the court decisions on this subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services. [H. Rept. 1337, 83d Cong., 2d Sess. 17 (1954).]
In 1956, the Treasury promulgated section 1.118-1, Income Tax Regs., which provides the following: Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred *272 to the corporation in consideration for goods or services rendered * * *
Because section 118 was meant to codify existing case law, it had little effect on judicial determinations concerning nonshareholder contributions. In 1957, this Court in Teleservice Co. v. Commissioner, 27 T.C. 722 (1957), affd. 254 F.2d 105 (3d Cir. 1958), held that payments received from customers to finance the construction of a television antenna system were payments for services, not contributions to capital, and thus were includable in income. We noted that the customer was required to make the contribution to be eligible to receive television service and the customer was also required to make monthly payments to receive the signals. Id. at 725. In distinguishing Edwards v. Cuba R.R., 268 U.S. 628 (1925), we stated the following: We think that the Supreme Court, in deciding the Cuba Railroad case, did not intend that the theory of that case should be extended so as to free from taxation a private contribution made in consideration of the performance of the contributee's *273 normal business function. * * * [Id. at 730.]
The Supreme Court revisited the issue in United States v. Chicago, B.&.Q. R.R., 412 U.S. 401 (1973), and held that subsidies paid by various Midwestern States to the taxpayer to fund some or all of the cost to construct railroad improvements were not contributions to capital, and thus the taxpayer had a zero basis in the assets constructed with the subsidies. With regard to its earlier opinions in Detroit Edison Co. v. Commissioner, supra, and Brown Shoe v. Commissioner, supra, the Supreme Court stated the following: It seems fair to say that neither in Detroit Edison nor in Brown Shoe did the Court focus upon the use to which the assets transferred were applied, or upon the economic and business consequences for the transferee corporation. Instead, the Court stressed the intent or motive of the transferor and determined the tax character of the transaction by that intent or motive. Thus, the decisional distinction between Detroit Edison and Brown Shoe rested upon the nature of the benefit to the transferor, rather than to the transferee, *274 and upon whether that benefit was direct or indirect, specific or general, certain or speculative. * * * [United States v. Chicago B.&.Q. R.R., supra at 411; fn. ref. omitted.]
The Supreme Court further stated: If at first glance Detroit Edison and Brown Shoe seem somewhat inconsistent, they may be reconciled, and indeed must be, on the ground that in Detroit Edison, the transferor intended no contribution to the transferee's capital, whereas in Brown Shoe the transferor did have that intent. [Id. at 412.]
The Supreme Court listed the following characteristics of a nonshareholder capital contribution: (1) It certainly must become a permanent part of the transferee's working capital structure; (2) it may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee; (3) it must be bargained for; (4) the asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value; and (5) the asset ordinarily, if not always, will be employed in or contribute to the production of additional *275 income and its value assured in that respect. Id. at 413; Southern Pac. Trans. Co. v. Commissioner, 75 T.C. 497, 758-759 (1980). We addressed the issue in State Farm Road Corp. v. Commissioner, 65 T.C. 217 (1975). State Farm Road involved whether moneys received by a private corporation from charges levied against prospective users to tie in to a sewer system should be included in income. The tie-in charges were non-refundable, one-time charges for hooking up property to the sewer system and were deposited in the corporation's general bank account. Id. at 221-222. We noted that the Supreme Court in Brown Shoe v. Commissioner, supra, "drew a distinction between payments to a corporation by prospective customers to induce extensions of services and payments to a corporation by community groups to induce the location of a factory in their community." State Farm Road Corp. v. Commissioner, supra at 224. We found that the tie-in charges were directly related to the services subsequently *276 rendered by the corporation, and concluded that Detroit Edison Co. v. Commissioner, 310 U.S. 98 (1943), and Teleservice Co. v. Commissioner, supra, required us to hold that the tie-in charges constituted taxable income to the corporation. Id. at 230. In the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2120, 90 Stat. 1520, 1912, Congress provided that a contribution to capital of a corporation included a "contribution in aid of construction" received by a regulated public utility which provides water or sewage disposal services. [10] The Treasury did not enact any regulations pursuant to the 1976 amendment, and the previous regulation remains in effect. *277 As background to the 1976 amendment, the Senate Finance Committee stated the following: Certain regulated public utilities (water and sewage disposal) have traditionally obtained a substantial portion of their capital needed for the construction of facilities through contributions in aid of construction. The concept of contributions in aid of construction originates from a line of early Board of Tax Appeals decisions dealing with amounts contributed by customers to public utilities to pay for extensions of service lines necessary to enable them to be serviced by the public utility. * * * [S. Rept. 94-938, at 434 (1976), 1976-3 (Vol. 3) C.B. 49, 472.]
While the statute as amended in 1976 left the term "contribution in aid of construction" undefined, the Senate Finance Committee explained: This provision amends the current rules concerning nonshareholder contributions to capital by specifying that amounts received as contributions in aid of construction by a water or sewage disposal utility (described in section 7701(a)(33)(A)(i)) which are used for qualified expenditures and which are not included in the rate base for rate making purposes by the regulatory body having *278 rate-making jurisdiction will be treated as nontaxable contributions to the capital of the utility. For this purpose, the Secretary is to prescribe rules defining what items and amounts constitute a contribution in aid of construction. The following are examples of facilities which the committee considers to be contributions in aid of construction. * * * (2) A builder or developer furnishes the necessary funds to a regulated water or sewage disposal utility which uses those funds to build certain water or sewage disposal facilities. [Id. at 435, 1976-3 C.B. (Vol. 3) at 473.]
After consideration of the nature of the payments to Imperial, in light of McArthy's intent, we hold that the payments constituted a contribution in aid of construction and thus are includable in petitioner's income. First, the payment to the escrow account was to be credited toward tap-on fees which would have been paid by future occupants of the trailer pads. Thus, the contribution was made on behalf of potential customers. Sec. 118(b). Second, we find that McArthy's intent in making the payment was to obtain sewer service for the property he was developing. Therefore, the payment in question *279 was motivated by the anticipation of a direct benefit. State Farm Road Corp. v. Commissioner, supra at 230. Third, the benefit to Imperial of owning the sewer extension appears not to have been commensurate with its value, but according to petitioner's argument, was worth less than the construction cost or the cash received. United States v. Chicago, B.&.Q. R.R., 412 U.S. 401 (1973). Finally, although the resulting asset was used for the production of income, given petitioner's arguments concerning the paucity of fees generated by the pipeline, its ability to generate additional income for Imperial cannot be said to be assured. Id.
Petitioner argues that McArthy chose the method of sewage treatment that would have the least negative effect on the environment, despite the fact that the method was the most costly of the three alternatives proposed and required him to pay a portion of the cost. Thus, petitioner claims that the choice benefited the public as a whole, and, as a result, the payment to Imperial constitutes a contribution to capital. While the sewer line extension may have been the best alternative *280 for the environment, it does not follow that the payment qualifies as a contribution to capital. We do not believe the beneficial effect on the environment to have been the primary motivating factor behind McArthy's choice. Significant disadvantages accompanied the on-site treatment options, making them infeasible or undesirable for Brookshire. The Brookshire tract was not large enough for a lagoon, and McArthy never talked with Mr. Sutton concerning locating the lagoon on the adjacent tract of land. Moreover, the on-site facilities would have been noisy and unsightly and would have emitted unpleasant odors, which would have detrimentally affected property values. By contrast, the extension to the Country Club Manor facility was feasible and did not significantly intrude upon the Brookshire tract. We find, therefore, that McArthy chose the main-line extension because it best suited his purposes in providing sewer service to Brookshire. The incidental benefit to the public does not affect our decision to hold the payment to be a contribution in aid of construction. Additionally, we do not find merit in petitioner's argument that contributions in aid of construction should not *281 constitute gross income within the meaning of the Sixteenth Amendment. We note that Edwards v. Cuba R.R., 268 U.S. 628 (1925), on which petitioner relies, is clearly distinguishable from this case. The payment involved in Edwards v. Cuba R.R., supra, was by the Government for the benefit to the public as a whole, whereas, here, the payment was by a private citizen for the provision of services. Finally, we reject petitioner's alternative argument that the amount of income includable should be the value of the mainline extension computed using the discounted cash-flow method based upon projected revenue. Imperial received cash. Imperial did not receive an operating sewer system, and, therefore, the projected income stream from the expansion of sewage capacity is irrelevant. The fact that Imperial used the cash to construct the main-line extension does not make the contribution equivalent to the asset constructed. We note that petitioner's reliance on the Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 (J. Comm. Print 1987), relating to section 118, is misplaced. Petitioner *282 received $ 35,625 in cash from the escrow account during 1988, and, accordingly, petitioner must recognize the $ 35,625 in income in 1988. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner conceded that $ 20,000 received from Clyde Johnson and $ 10,500 received from Southern States Land and Investment Co. constitute taxable income.↩
3. In the course of choosing a sewage treatment method, however, McArthy filed a proposal with the DNR concerning the construction of an on-site lagoon.↩
4. That potential, however, was somewhat limited due to the relatively narrow watershed.↩
5. The tariff schedule did not list any charge denominated as a "tap-on fee". The term "tap-on fee" is commonly used interchangeably with the term "contribution in aid of construction".↩
6. Imperial entered into the agreement after analyzing the potential revenue stream from the sewer service based upon Brookshire's capacity of 266 trailer pads, increasing occupancy at a rate of 50 per year before becoming fully occupied after 5 years, and monthly sewer usage fees of $ 18 for each pad.↩
7. Fribis drafted the contract and often uses the terms "tap-on fee" and "contribution in aid of construction" interchangeably. By reference to the General Rules and Regulations Applying to Sewer Service (Sewer Service Rules), Fribis intended that the term "tap-on fee" used in the contract would correspond to the term "contribution in aid of construction" used in the Sewer Service Rules.↩
8. The expansion did not materially increase the capacity of Imperial's plant beyond that which was anticipated to treat the 60,000 gallon daily sewage flow expected from Brookshire, assuming Brookshire was fully developed at 266 pads.↩
9. Petitioner included as income on its 1988 Federal income tax return the $ 164,375 in disbursements from the escrow account during 1988 and claimed depreciation with respect to improvements made with the 1988 disbursements.↩
10. In the Revenue Act of 1978, Pub. L. 95-600, sec. 364, 92 Stat. 2763, 2854, sec. 118 was amended to extend coverage to regulated public utility providing gas and electric services. Immediately before amendment in 1986, section 118 read in pertinent part as follows: SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.
* * * (b) Contributions in Aid of Construction. --
(1) General rule. -- For purposes of this section, the term "contribution to the capital of the taxpayer" includes any amount of money or other property received from any person (whether or not a shareholder) by a regulated public utility which provides electric energy, gas (through a local distribution system or transportation by pipeline), water, or sewerage disposal services if -- (A) such amount is a contribution in aid of construction,
* * * (3) Definitions. -- For purposes of this section -- (A) Contribution in aid of construction. -- The term "contribution in aid of construction" shall be defined by regulations prescribed by the Secretary; except that such term shall not include amounts paid as customer connection fees (including amounts paid to connect the customer's line to an electric line, a gas main, a steam line, or a main water or sewer line and amounts paid as service charges for starting or stopping services).↩